[No. S118034. Aug. 19, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
QUINCY ROBERTSON, Defendant and Appellant.

158

**Counsel**

Juliana Drous, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Laurence K. Sullivan, Acting Assistant Attorney General, Catherine A. Rivlin, Seth K. Schalit and William M. Kuimelis, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**GEORGE, C. J.**—In this case we must determine whether the trial court properly instructed the jury that defendant could be convicted of second degree felony murder based upon the predicate offense of discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3),[1] or whether the second degree felony-murder rule was inapplicable under the so-called merger doctrine referred to in *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*) and later cases. For the reasons explained below, we conclude that the merger doctrine did not bar instruction on second degree murder based upon a felony-murder theory. Although the

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

Court of Appeal majority reached a contrary conclusion, it nonetheless affirmed the judgment of conviction, finding harmless any error on the part of the trial court in instructing the jury that it could convict defendant under a second degree felony-murder theory. Because we conclude the trial court did not err in instructing the jury, we affirm the judgment of the Court of Appeal upholding defendant's conviction.

## I

Defendant Quincy Robertson was convicted of second degree murder (§ 187) and committing assault with a deadly weapon and by means of force likely to inflict great bodily injury. (§ 245, subd. (a)(1).) The jury found true the following allegations: that defendant personally used a firearm in the commission of these offenses (§§ 1203.06, 12022.5); that, in connection with the murder charge, he intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53, subd. (d)); and that, in connection with the assault charge, he inflicted great bodily injury (§ 12022.7). The court sentenced defendant to a term of 15 years to life in prison for the murder, with an enhancement of 25 years to life pursuant to section 12022.53, subdivision (d). The court also sentenced him to a concurrent term of eight years in prison for the assault offense, enhanced by the firearm-use and great-bodily-injury findings.

During the evening of December 27, 1998, the victims Kehinde Riley and Ricky Harris, joined by Bradley Gentry and Lamont Benton, imbibed alcohol and used marijuana and cocaine while they went for a drive in Benton's automobile. At approximately 10:30 p.m., they stopped in front of defendant's residence on 99th Avenue Court in Oakland. Riley and Harris approached defendant's automobile, a Chevrolet Caprice Classic, which was parked in front of defendant's residence. According to Benton's testimony at trial, while Gentry and Benton looked on, Riley and Harris began removing the vehicle's hubcaps, making loud noises in the process. They had removed the passenger side hubcaps and were turning to the driver side hubcaps when defendant emerged onto the porch of his residence.

According to statements subsequently made by defendant to the police, he had been watching television with his wife and children, heard a loud noise and, retrieving a firearm, went outside to investigate. Defendant denied any involvement in the shooting in his initial statement. After gunshot residue was discovered on his right hand, defendant claimed he had fired a weapon earlier in the day to demonstrate its operation for a prospective buyer. Following further interrogation, defendant explained that upon hearing a sound outside, he looked out and observed three or four men near his automobile, apparently engaged either in dismantling it or stealing it. Defendant recalled that the men

looked at him in a threatening manner, and he was uncertain whether they would attempt to enter his residence. In his final statement to the police, defendant claimed that when he emerged from his residence, he held his gun at a 45-degree angle and fired two warning shots. The physical evidence, however, indicated that three shots had been fired. A bullet hole discovered in the windshield of defendant's automobile and two other bullet holes found two feet above ground level in a vehicle that was parked across the street tended to disprove defendant's claim that he had held the gun at a 45-degree angle.

Benton testified at trial that immediately following defendant's discharge of the weapon from the porch, Benton and Gentry drove away, while Riley and Harris attempted to flee on foot. Benton testified he heard from seven to nine additional gunshots as he drove away. Defendant, claiming he had heard a sound that resembled either a car backfire or the discharge of a firearm, admitted in his final statement to the police that he had walked at least as far as the sidewalk and possibly into the street before firing three shots at the fleeing men. He denied intending that the shots hit the men and claimed that he fired upwards into the air, intending, as he said, to "scare people away from my domain." He conceded that firing a weapon in a residential neighborhood was dangerous to human life, but said he had not been thinking clearly.

Riley's body was discovered approximately 50 yards from where gun casings indicated the firearm had been discharged. It appeared the shots had been fired by a person standing in the middle of the street in front of defendant's residence. Riley had been shot in the back of the head. Harris suffered a gunshot wound to the sole of his right foot.

On the night of the incident, one of defendant's neighbors heard shots and witnessed a person standing in a "firing stance" in the street, firing shot after shot straight ahead and on each occasion correcting for the weapon's "kickback." The neighbor witnessed this person "swagger" back to the apartment complex where defendant resided.

One bullet casing was discovered on the porch of defendant's residence, two additional casings at the bottom of the stairs leading to defendant's apartment, and seven casings in the middle of the street in front of defendant's residence. Based upon the location of the bullet casings found in the street, the physical features of the surrounding neighborhood, and the location at which Riley and Harris were discovered after the shooting, the prosecution's ballistics expert testified that if the person who fired the weapon had held it at a 45-degree angle, he or she would not have struck the victims. This witness testified that in his opinion, the shooter must have pointed the weapon at the victims.

Character witnesses who testified in favor of defendant asserted that he was not a violent person, nor was he prone to anger. He enjoyed working on cars and was engaged in restoring his Chevrolet Caprice Classic for resale. Defendant's wife testified that during the time they resided on 99th Avenue Court, at least three of the family's vehicles had been broken into or vandalized.

Defendant's nephew recounted an episode in which defendant had been the victim of a shooting. The episode occurred six months prior to the charged crimes, following an automobile accident involving this nephew and the driver of another vehicle. After an argument erupted between the nephew and the other driver and while defendant was attempting to subdue his nephew, someone from the other vehicle fired on them, seriously injuring defendant's right arm. A clinical psychologist testified in defendant's behalf, expressing the opinion that defendant suffered from posttraumatic stress syndrome as a result of this and other incidents, that this condition caused defendant to be fearful and easily aroused emotionally, and that defendant likely had acted impulsively, without forethought, when he fired on the victims.

A ballistics expert testified on behalf of defendant, stating that persons lacking experience in shooting firearms tend to shoot in a manner that causes them to strike objects below their intended target.

In connection with the homicide charge, the jury was instructed on first degree murder, second degree murder with express malice, second degree murder with implied malice, second degree felony murder based on commission of the crime of discharging a firearm in a grossly negligent manner, and voluntary manslaughter. The defense argued that, at most, defendant might be liable for voluntary manslaughter on the theory that he acted in the heat of passion or from an honest but unreasonable belief in the need to defend himself.

The jury deliberated for three days. At that point, a juror who complained of debilitating stress arising from asserted conflict among the deliberating jurors was excused. The juror was replaced by an alternate, and the jury deliberated for an additional three days prior to rendering its verdict.

Defendant appealed, asserting, among other contentions, that the trial court erred in instructing the jury on second degree felony murder based upon the predicate offense of discharging a firearm in a grossly negligent manner, because, under the teaching of *Ireland, supra*, 70 Cal.2d 522, the latter offense necessarily merged with the homicide. A majority of the Court of Appeal agreed, but determined that the error was harmless because, in view of the particular instructions given in the present case, the verdict finding

defendant guilty of the aggravated assault on Harris also demonstrated that the jury necessarily rejected defendant's primary argument that when he shot the victims, he merely intended to frighten them away from his residence. The remaining justice concurred in the judgment only, concluding that it was unnecessary for the court to comment on the merger doctrine, because any error was harmless.

## II

We must determine whether the trial court erred by instructing the jury that defendant could be found guilty of second degree felony murder if the killing was committed in the course of discharging a firearm in a grossly negligent manner in violation of section 246.3. The resolution of this question requires a brief review of the elements of various homicide offenses, the second degree felony-murder doctrine, and the merger doctrine.

■ Murder is defined as an unlawful killing committed with malice aforethought. (§ 187, subd. (a).) An unlawful killing with malice afore-thought, perpetrated by certain specified means or that is willful, deliberate, and premeditated, constitutes murder in the first degree. (§ 189.) A killing in the course of the commission of certain enumerated felonies also constitutes murder in the first degree. (§ 189.)

■ Second degree murder is an unlawful killing with malice afore-thought, but without the elements that elevate an unlawful killing to first degree murder. (§§ 187, subd. (a), 189; *People v. Hansen* (1994) 9 Cal.4th 300, 307 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*).) In addition, an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189, constitutes at least murder in the second degree. (*People v. Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].)

■ Malice may be express or implied. Malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*) More specifically, "malice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' [Citation.]" (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].) ■ An unlawful killing may constitute manslaughter rather than murder even in the presence of intent to kill or conscious disregard for life, however, if the defendant killed in a

"sudden quarrel or heat of passion" (§ 192, subd. (a); *People v. Lasko, supra*, 23 Cal.4th at pp. 108, 110–111) or in an unreasonable but good faith belief in the need to act in self defense. (*People v. Blakeley* (2000) 23 Cal.4th 82, 89, 91 [96 Cal.Rptr.2d 451, 999 P.2d 675].)

■ The felony-murder rule eliminates the need for proof of malice in connection with a charge of murder, thereby rendering irrelevant the presence or absence of actual malice, both with regard to first degree felony murder and second degree felony murder. (*Hansen, supra*, 9 Cal.4th at p. 308; *People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549]; *Ireland, supra*, 70 Cal.2d at pp. 538, 539.) As we have explained: "Implied malice, for which the second degree felony-murder doctrine acts as a substitute [fn. omitted], has both a physical and a mental component. . . . The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' [Citation.] [¶] ■ The second degree felony-murder rule eliminates the need for the prosecution to establish the mental component." (*People v. Patterson, supra*, 49 Cal.3d at p. 626, italics omitted.)

■ Because malice has been eliminated as an element, circumstances that may serve to reduce the crime from murder to manslaughter, such as provocation or imperfect self-defense, are not relevant in the case of a felony murder. (*People v. Seaton* (2001) 26 Cal.4th 598, 665 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People v. Balderas* (1985) 41 Cal.3d 144, 197 [222 Cal.Rptr. 184, 711 P.2d 480] [provocation and heat of passion cannot reduce a felony murder to manslaughter, because " 'malice,' the mental state which otherwise distinguishes murder from voluntary manslaughter, is not an element of felony murder"]; *People v. Ford, supra*, 60 Cal.2d at p. 795 [unlawful killing in the course of an inherently dangerous felony cannot constitute manslaughter but constitutes at least second degree murder]; *Ireland, supra*, 70 Cal.2d at p. 539 & fn. 13 [but for the merger doctrine, a second degree felony-murder instruction that correctly stated the law would permit the jury to disregard the defendant's diminished capacity defense]; *People v. Tabios* (1998) 67 Cal.App.4th 1, 8–9 [78 Cal.Rptr.2d 753] [claim of imperfect self-defense is irrelevant to the charge of second degree felony murder]; *People v. Anderson* (1991) 233 Cal.App.3d 1646, 1666 [285 Cal.Rptr. 523]; *People v. Loustaunau* (1986) 181 Cal.App.3d 163, 170 [226 Cal.Rptr. 216].)

A principal purpose of the felony-murder rule is deterrence. Case law has emphasized the need to deter the commission of felonies that put human life at risk (*Hansen, supra*, 9 Cal.4th at pp. 310, 311, 314; *People v. Satchell* (1971) 6 Cal.3d 28, 42–43 [98 Cal.Rptr. 33, 489 P.2d 1361], disapproved on

another ground in *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869]) [the doctrine is intended to deter felonious acts "in which danger to human life is inherent"]; *People v. Clem* (2000) 78 Cal.App.4th 346, 349 [92 Cal.Rptr.2d 727]), and also the need to deter persons who commit such felonies from committing negligent or accidental killings in the course of these felonies. (*Hansen, supra,* 9 Cal.4th at pp. 308, 310, 315; *People v. Clem, supra,* 78 Cal.App.4th at p. 349.)

■ The first degree felony-murder rule is a creation of statute. (§ 189.) The second degree felony-murder rule is a common law doctrine. In the case of a second degree felony-murder charge, the inherent danger to human life posed by the defendant's unlawful conduct serves to justify the conclusion that proof of actual malice should not be required. (*Hansen,* supra, 9 Cal.4th at p. 308; *People v. Satchell, supra,* 6 Cal.3d at p. 43.) We have explained that "when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life . . . ." (*People v. Patterson, supra,* 49 Cal.3d at p. 626.)

The second degree felony-murder doctrine is limited to inherently danger-ous felonies because, in the absence of such danger, it would be less justifiable to remove the element of malice from the prosecutor's burden of proof. (*Hansen, supra,* 9 Cal.4th at p. 308; *People v. Satchell, supra,* 6 Cal.3d at p. 43.) "[O]nly felonies 'inherently dangerous to human life' are suffi-ciently indicative of a defendant's culpable mens rea to warrant application of the felony-murder rule." (*Hansen, supra,* 9 Cal.4th at p. 314.) The commis-sion of an inherently dangerous felony indicates that the killing was "tinged with malevolence." (*People v. Burroughs* (1984) 35 Cal.3d 824, 832 [201 Cal.Rptr. 319, 678 P.2d 894].)

The doctrine is limited to inherently dangerous felonies for the additional reason that the hazard to life presented by such felonies is foreseeable. When the danger is foreseeable, it is rational to expect a felon to take precautions not to kill accidentally or negligently—or to forgo commission of the hazardous felony altogether. (See *Hansen, supra,* 9 Cal.4th at pp. 308, 314.) A defendant is unlikely to be deterred if it is not reasonably foreseeable to him or her that " ' "death might arise solely from the fact that he [or she] will commit the felony." ' " (*Id.* at p. 308.)

■ A felony is considered inherently dangerous to human life when the felony, viewed in the abstract, "by its very nature . . . cannot be committed without creating a substantial risk that someone will be killed" (*People v. Burroughs, supra,* 35 Cal.3d at p. 833), or carries a " 'high probability' that death will result." (*People v. Patterson, supra,* 49 Cal.3d at p. 627; see also

*Hansen, supra*, 9 Cal.4th at pp. 309, 329 (conc. & dis. opn. of Kennard, J.) [observing that a felony may carry a high probability that death will result even though death may not result in "a majority, or even in a great percentage, of instances"]; *People v. Clem, supra*, 78 Cal.App.4th at p. 349 [" ' "[h]igh probability" ' in this context does not mean a ' "greater than 50 percent" ' chance"].)

In the present case, as we previously noted, the court instructed the jury on first degree murder, second degree murder with express malice, second degree murder with implied malice, second degree felony murder, and voluntary manslaughter. For the purpose of the second degree felony-murder rule, it instructed that the predicate felony was the discharge of a firearm in a grossly negligent manner, which is defined as follows: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison." (§ 246.3.)[2]

Section 246.3 was enacted primarily to deter the dangerous practice that exists in some communities of discharging firearms into the air in celebration of festive occasions. (*People v. Clem, supra*, 78 Cal.App.4th at p. 350; *People v. Alonzo* (1993) 13 Cal.App.4th 535, 539–540 [16 Cal.Rptr.2d 656] [referring to the crime as constituting a reckless act that endangers the public directly and that also generates the risk of responsive gunfire].)

■ Section 246.3 requires proof that the defendant intended to discharge the firearm. (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437, 1438–1440 [35 Cal.Rptr.2d 155].) A defendant who believed that the firearm he or she discharged was unloaded, for example, would not be guilty of a violation of section 246.3. (*In re Jerry R.*, at p. 1440.) In addition, there are circumstances in which the discharge of a firearm is not unlawful, even if the act entails a risk of serious harm to other persons. One may be privileged to employ force, including that involved in the discharge of a firearm, in defense of oneself or another or of property, under defined circumstances. One is entitled to use such force as is reasonable under the circumstances to repel what is honestly and reasonably perceived to be a threat of imminent harm. (§§ 197, 198, 692–694; *People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065 [56 Cal.Rptr.2d 133, 920 P.2d 1337]; *People v. Myers* (1998) 61 Cal.App.4th 328, 334–335 [71 Cal.Rptr.2d 518]; CALJIC No. 9.03.3 [willful discharge of a

---

[2] The question whether an offense that may be punished either as a felony or a misdemeanor may serve as the basis for a felony-murder instruction has not been raised in this case. (See *People v. Satchell, supra*, 6 Cal.3d at p. 35, fn. 13 [it is appropriate to rely upon such a predicate offense in a second degree felony-murder prosecution]; see also *People v. Clem, supra*, 78 Cal.App.4th at p. 350, fn. 2.)

firearm is not unlawful if executed in self-defense or defense of another; prosecution must prove discharge is not in lawful self-defense or defense of another]; see also CALJIC Nos. 5.12 [justifiable homicide], 5.13 [same], 5.32 [legitimate use of force in defense of another]; 5.40 [defense of property—ejection of trespasser], 5.42 [resisting intruder], 5.43 [defense of property], 5.44 [presumptions arising from the defendant's forcible entry into a home].)

As for the requirement that the defendant must have discharged the firearm in a "grossly negligent" manner, the term is not defined by the statute, but its usual meaning in the context of establishing criminal liability is " ' "aggravated, culpable, gross, or reckless . . . conduct [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . ." ' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783 [118 Cal.Rptr.2d 3, 42 P.3d 511].) As we have observed, "criminal negligence is the appropriate standard when the act is intrinsically lawful . . . but warrants criminal liability because the surrounding circumstances present a high risk of serious injury. Criminal negligence is not a 'lesser state of mind'; it is a standard for determining when an act may be punished under the penal law because it is such a departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances." (*Id.* at pp. 789–790.)

The jury was instructed in the present case: " 'Gross negligence' refers to a negligent act which is aggravated, reckless or flagrant and which is such a departure from the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life or a danger to human life or to constitute indifference to the consequences of those acts. The facts must be such that the consequences of the negligent act could reasonably have been foreseen and it must appear that the death or danger to human life was not the result of inattention, mistaken judgment or misadventure but the natural and probable result of an aggravated, reckless or flagrantly negligent act." (See CALJIC No. 3.36; see also *People v. Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *People v. Alonzo, supra,* 13 Cal.App.4th at pp. 539–540 [applying this standard to a prosecution for violation of section 246.3].) Again, gross negligence is not present when the discharge of a firearm is honestly and reasonably undertaken in defense of self or another or of property.

The court in *People v. Clem, supra,* 78 Cal. App.4th 346, concluded that section 246.3 constitutes an inherently dangerous felony for the purpose of the second degree felony-murder rule (*People v. Clem, supra,* at pp. 353–354), and defendant does not challenge this conclusion. The appellate court quoted our observation that " '[t]he tragic death of innocent and

often random victims . . . as the result of the discharge of firearms, has become an alarmingly common occurrence in our society—a phenomenon of enormous concern to the public' " (*People v. Clem, supra,* 78 Cal.App.4th at p. 351, quoting *Hansen, supra,* 9 Cal.4th at p. 311.) The court reasoned that the offense is inherently dangerous because it involves discharge of the highly lethal instrumentality of a firearm with gross negligence in a manner that "could result in injury or death to a person" (§ 246.3). It added that " '[i]mminent deadly consequences [are] inherent in the act' [citation] even if the bullet fortuitously falls so as to injure and not kill." (*People v. Clem, supra,* 78 Cal.App.4th at p. 353.) By its terms, the statute "presupposes that there are people in harm's way" (*id.* at p. 351) and that a reasonable person in defendant's situation would have "reasonable grounds to suspect that people will be endangered." (*Id.* at p. 352.) The court concluded that "a killer who violates section 246.3 'is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it.' " (*Id.* at p. 353)

On appeal, although defendant does not dispute that the grossly negligent discharge of a firearm in violation of section 246.3 constitutes an inherently dangerous felony for the purpose of the second degree felony-murder rule, he claims that the merger doctrine precludes the use of a violation of section 246.3 as a predicate offense upon which to base liability for second degree felony murder. The Court of Appeal agreed.

The merger doctrine was recognized by this court in *Ireland, supra,* 70 Cal.2d 522. In that case, we held that the trial court erred in instructing the jury on second degree felony murder based on the crime of assault with a deadly weapon. The defendant's crime of assault with a deadly weapon merged with a resulting homicide and could not form the basis for an application of the second degree felony-murder rule. The instructional error was prejudicial because, as we have seen, malice is not an element of second degree felony murder and therefore the felony-murder instruction in the *Ireland* case permitted the jury to disregard the defendant's diminished capacity defense. (*Id.* at p. 539 & fn. 13.) We observed that "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as the result of felonious assault—a category which includes the great majority of all homicides." (*Id.* at p. 539.) The felony-murder instruction is not proper when the predicate felony is an "integral part of the homicide" and when, under the prosecution's evidence, it is "included in fact within the offense charged." (*Id.* at p. 539, italics omitted.)

More recently, in *Hansen, supra*, 9 Cal.4th 300, we explained that the *Ireland* rule was intended to avoid elevating every felonious assault that ends in death to second degree murder, a result that would "usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice aforethought, and therefore punishable as manslaughter)." (*Hansen, supra*, 9 Cal.4th at pp. 311–312.) We concluded in *Hansen*, however, that such a disfavored result would *not* follow when a felony-murder verdict is based upon the crime of discharging a weapon at an inhabited dwelling. We rejected the defendant's contrary and "unduly expansive view of the scope of the 'merger' doctrine." (*Id.* at p. 311.)

We have cautioned that, traditionally, the merger rule has not been extended to offenses other than assault. (*Hansen, supra*, 9 Cal.4th at p. 312.) The merger rule is premised upon the concern that it "would subvert the legislative intent for a court to apply the felony-murder rule automatically to elevate all felonious assaults resulting in death to second degree murder even where the felon does not act with malice. In other words, if the felony-murder rule were applied to felonious assaults, all such assaults ending in death would constitute murder, effectively eliminating the requirement of malice—a result clearly contrary to legislative intent." (*Id.* at p. 314, italics omitted.)

In *Ireland*, we referred to assaults that merge with a homicide because they are an "integral part of" and "included in fact" within the homicide. (*Ireland, supra*, 70 Cal.2d at p. 539, italics omitted.) Subsequently, in *People v. Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193], we rejected a claim of merger on a different theory. In *Mattison*, the defendant was a prison inmate who furnished methyl alcohol to a fellow inmate, causing the latter's death. We held that the trial court properly instructed on second degree felony murder based on the furnishing offense. We explained that the merger doctrine does not apply when death results from defendant's commission of a felony with an independent purpose, that is, when the felony that provides the basis for the felony-murder conviction "was not done with the intent to commit injury which would cause death." (*Id.* at p. 185.) We rejected the defendant's claim that the offense of furnishing poisonous alcohol merged with the resulting homicide; there was no merger, because the felony-murder verdict was based upon defendant's commission of a felony with a " 'collateral and independent felonious design.' " (*Ibid.*) We expressed confidence that *our conclusion was consistent with the deterrent purpose of the felony-murder* rule, because we envisioned that application of the felony-murder rule would deter commission of the underlying inherently dangerous crime. (*Id.* at

pp. 185, 186.) Although a person who has decided to assault another would not be deterred by the felony-murder rule, we declared, a defendant with some collateral purpose may be deterred. The knowledge that a murder conviction may follow if an offense such as furnishing a controlled substance or tainted alcohol causes death " 'should have some effect on the defendant's readiness to do the furnishing.' " (*Id.* at p. 185.)

In the *Mattison* case, we concluded that use of the second degree felony-murder rule was appropriate when the purpose of the predicate felony was independent of or collateral to an intent to cause injury that would result in death. (*People v. Mattison, supra,* 4 Cal.3d at p. 185.) Although the collateral purpose rationale may have its drawbacks in some situations (*Hansen, supra,* 9 Cal.4th at p. 315), we believe it provides the most appropriate framework to determine whether, under the facts of the present case, the trial court properly instructed the jury. The defendant's asserted underlying purpose was to frighten away the young men who were burglarizing his automobile. According to defendant's own statements, the discharge of the firearm was undertaken with a purpose collateral to the resulting homicide, rendering the challenged instruction permissible. As Justice Werdegar pointed out in her concurring opinion in *Hansen,* a defendant who discharges a firearm at an inhabited dwelling house, for example, has a purpose independent from the commission of a resulting homicide if the defendant claims he or she shot to intimidate, rather than to injure or kill the occupants. (*Hansen, supra,* 9 Cal.4th at p. 318 (conc. opn. of Werdegar, J.).)

As the Court of Appeal majority itself recognized, we have declared that the second degree felony-murder rule is intended to deter both carelessness in the commission of a crime and the commission of the inherently dangerous crime itself. (*Hansen, supra,* 9 Cal.4th at pp. 310, 311, 314; *People v. Mattison, supra,* 4 Cal.3d at p. 185.) We believe that a deterrent purpose is served under the second degree felony-murder rule in the case of a violation of section 246.3 because, by definition, it must be reasonably foreseeable to such a defendant that the intentional discharge of the firearm could result in injury or death. In view of the reasonable foreseeability of the risk of injury or death, knowledge that punishment for second degree felony murder may ensue if a death occurs may deter individuals from illegally discharging a firearm—whether they are contemplating doing so in order to celebrate a festive occasion or for some other purpose such as to frighten away persons who do not present what a reasonable person would consider a threat of imminent harm to the defendant. Of course, if a defendant reasonably discharged a firearm to frighten away a person who did present what a reasonable person would consider to be an imminent threat, the prosecution would not be able to establish a violation of section 246.3 even if an injury or death resulted, and no felony-murder conviction would ensue.

The Court of Appeal majority questioned the applicability of the collateral purpose rationale when the underlying felony is based upon the defendant's gross negligence, stating "[t]he 'independent felonious design' test, which turns on the purpose of the defendant's actions, does not fit well with negligent conduct, and its outcome here would also be uncertain, given appellant's statements that he merely intended to frighten away the victims." The Court of Appeal majority asserted that the deterrent purpose of the felony-murder rule would not be served if a conviction could be based upon a violation of section 246.3, again because the crime is one involving gross negligence. The Court of Appeal majority stated: "It makes no sense to speak of promoting careful gross negligence." It does make sense, however, to speak of deterring persons from discharging a firearm in a grossly negligent manner that could result in injury or death. It certainly is possible to encourage the prudent handling of firearms by punishing reckless imprudence in the handling and discharge of such weapons.

The Court of Appeal majority believed that the conclusion it reached had the effect of avoiding absurd results, stating: "If grossly negligent discharge of a firearm does not merge with a resulting homicide, then defendants who say, 'I didn't mean to do it' will in effect be pleading guilty to second degree felony murder in a majority of homicide cases." Of course, the result predicted by the Court of Appeal majority and by defendant will not occur in any of the many homicide cases in which a firearm is not used. Nor will it occur when the defendant's claim that he or she did not intend to kill or injure the victim arises in the context of a defense to the section 246.3 charge involving the discharge of a firearm with the intent to frighten away an intruder as a reasonable response to an imminent threat to self, others, or property. Nor will it occur if the defendant's defense to the section 246.3 charge is that the discharge itself was unintentional.

In addition, in making the above statement, the Court of Appeal majority overlooked one of the underlying justifications for the second degree felony-murder rule: when the danger to human life is so foreseeable to reasonable persons that the felony has been designated as one that is inherently dangerous to human life, the very foreseeability of this danger has led courts to conclude that the defendant's claim that he or she "didn't mean to do it" should not be heard, once the mental state necessary to the underlying offense has been proved. As we have stated, "when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life . . . ." (*People v. Patterson, supra,* 49 Cal.3d at p. 626.)

The Court of Appeal majority added that application of the merger doctrine was necessary in order to avoid the absurd consequence that "[d]efendants

who admit an intent to kill, but claim to have acted with provocation or in honest but unreasonable self-defense, would likely have a stronger chance [than defendants who claimed 'I didn't meant to do it'] of being convicted of the lesser offense of voluntary manslaughter."

The asserted anomaly identified by the Court of Appeal is characteristic of the second degree felony-murder rule in general and is inherent in the doctrine's premise that it is reasonable to impute malice—or, more precisely, to eliminate consideration of the presence or absence of actual malice—because of the defendant's commission of an underlying felony that is inherently and foreseeably dangerous. (See *Hansen, supra,* 9 Cal.4th at p. 308; *People v. Satchell, supra,* 6 Cal.3d at p. 43.) Reliance on section 246.3 as the predicate offense presents no greater anomaly in this regard than such reliance on any other inherently dangerous felony.

Defendant urges us to extend the merger doctrine to encompass violations of section 246.3 on the basis of the language in some of our cases expressing unease with the expansion of the felony-murder rule. (See, e.g., *People v. Patterson, supra,* 49 Cal.3d at pp. 621, 627.) We decline defendant's invitation to restrict the felony-murder rule by expanding the merger doctrine in the present case. The second degree felony-murder rule is well established. (*Id.* at p. 621 ["The second degree felony-murder doctrine has been a part of California's criminal law for many decades"].) Although the merger doctrine forestalls the substitution of proof of an *assault* for proof of malice out of a concern that, in the great majority of homicide cases, such a substitution would enable the second degree felony-murder rule to supersede the requirement of malice, the same concern does not appear under the present circumstances.

 We conclude that the merger doctrine does not preclude application of the felony-murder rule under the facts of the present case and that the trial court did not err by instructing the jury concerning the second degree felony-murder rule and the predicate offense of discharging a firearm in a grossly negligent manner.

Although we disagree with Court of Appeal majority's application of the merger doctrine, the Court of Appeal, as already noted, affirmed the judgment of conviction on the ground that any error was harmless. Because we conclude that the trial court did not err in instructing the jury on the second degree felony-murder rule, we agree with the Court of Appeal's conclusion that the judgment of conviction should be affirmed.

## III

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

Baxter, J., Chin, J., and Moreno, J., concurred.

**MORENO, J.,** Concurring.—I concur in the opinion and agree with the majority's analysis and holding that the merger doctrine (*People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580]) does not preclude the offense of willful "discharge [of] a firearm in a grossly negligent manner" (Pen. Code, § 246.3)[1] from serving as a predicate felony for second degree felony murder. Viewing the offense of discharging a firearm in a grossly negligent manner in the abstract (maj. opn., *ante*, at p. 167; *People v. Burroughs* (1984) 35 Cal.3d 824, 833 [201 Cal.Rptr. 319, 678 P.2d 894] (*Burroughs*); *People v. Patterson* (1989) 49 Cal.3d 615, 620 [262 Cal.Rptr. 195, 778 P.2d 549] (*Patterson*)), there can be no doubt it is inherently dangerous to human life, a proposition defendant does not contest (maj. opn., *ante*, at p. 168), thereby making it eligible to be a predicate felony under existing precedent (maj. opn., *ante*, at p. 166; *People v. Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361], disapproved on another point in *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *Patterson, supra*, 49 Cal.3d at p. 620). However, I write separately and briefly to express my concern, not with the majority's resolution of the precise issue presented in this case, but with a broader issue not raised by defendant—whether this court should continue to adhere to the doctrine of second degree felony murder.[2]

This court has defined second degree felony murder as " '[a] homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) . . . .' " (*Patterson, supra*, 49 Cal.3d at p. 620, quoting *People v. Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) As the majority points out, second degree felony murder is well established in California. (Maj. opn., *ante*, at p. 173.) But unlike first degree felony murder, which is codified in section 189 (*People v. Dillon* (1983) 34 Cal.3d 441, 472 [194 Cal.Rptr. 390, 668 P.2d 697]), "the second degree felony-murder rule remains, as it has been since 1872, a judge-made doctrine without any express basis in the Penal Code" (*id*. at p. 472, fn. 19; see also maj. opn., *ante*, at p. 166).

The felony-murder rule has been roundly criticized both by commentators and this court. As one commentator put it, "[t]he felony murder rule has an

---

[1] All further statutory references are to the Penal Code.

[2] Defendant does not challenge the doctrine; therefore the issue is not directly before this court.

extensive history of thoughtful condemnation." (Gerber, *The Felony Murder Rule: Conundrum Without Principle* (1999) 31 Ariz. St. L.J. 763, 766.) This court recognized in *People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130], that the "felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability." (See also *In re Christian S.* (1994) 7 Cal.4th 768, 785 [30 Cal.Rptr.2d 33, 872 P.2d 574] (conc. opn. of Mosk, J.); *People v. Satchell, supra,* 6 Cal.3d at p. 33.) In *Burroughs,* we said that "[t]his court has long held the felony-murder rule in disfavor. 'We have repeatedly stated that felony murder is a "highly artificial concept" which "deserves no extension beyond its required application." ' [Citations.]" (*Burroughs, supra,* 35 Cal.3d at p. 829.) We acknowledged our previous criticism of this rule: " 'The felony-murder doctrine has been censured not only because it artificially imposes malice as to one crime because of defendant's commission of another but because it anachronistically resurrects from a bygone age a "barbaric" concept that has been discarded in the place of its origin.' " (*Ibid.,* fn. 3, quoting *People v. Phillips* (1966) 64 Cal.2d 574, 583, fn. 6 [51 Cal.Rptr. 225, 414 P.2d 353]; see also *Burroughs, supra,* 35 Cal.3d at pp. 836–854 (conc. opn. of Bird, C. J.) [providing a comprehensive overview and critique of the felony-murder doctrine].)

While commentators criticized, and continue to criticize, the doctrine in both its first and second degree manifestations, my concern here is not with first degree felony murder, which is limited to a few legislatively enumerated felonies and is expressly codified. Absent constitutional infirmity this court is not in a position to abrogate first degree felony murder. (See *People v. Dillon, supra,* 34 Cal.3d at p. 463 ["the first degree felony-murder rule is a creature of statute" that this court may not judicially abrogate "merely because it is unwise or outdated"].) The same is not true of second degree felony murder. Second degree felony murder does not have the same statutory basis, and may be abrogated by this court. (See *Patterson, supra,* 49 Cal.3d at p. 641 (conc. & dis. opn. of Panelli, J. [stating doctrine is court created and calling upon the Legislature to intervene]; *Burroughs, supra,* 35 Cal.3d at p. 836 (conc. opn. of Bird, C. J.) ["The time has come for this court to discard the artificial and court-created offense of second degree felony murder"].)

Acknowledging the criticism leveled against the second degree felony-murder doctrine, this court in *Patterson* declined the invitation to reconsider the doctrine, stating that the "Legislature . . . has taken no action to alter this judicially created rule, and has declined our more recent suggestion in *People v. Dillon*[, *supra,* 34 Cal.3d at page 472, footnote 19], that it reconsider the rules on first and second degree felony murder and misdemeanor manslaughter." (*Patterson, supra,* 49 Cal.3d at p. 621.) Because I believe the doctrine is deeply flawed and the issue is important, I do not

believe legislative acquiescence should deter this court from reassessing the rule in an appropriate case.

The facts of this case bring into focus the inherent problems with the second degree felony-murder rule. As the Attorney General stated during oral argument, the only reason the felony-murder instruction was submitted to the jury is because defendant told the police that "he didn't mean it, he didn't intend to do this, he wasn't trying to hurt anybody; he wasn't angry; he wasn't upset; he was just trying to scare people away from his domain." The Attorney General further asserted that had defendant not made those statements to the police, the felony of grossly negligent discharge of a firearm, which served as the predicate offense for the second degree felony-murder instruction, would not have been considered. This court queried whether defendant actually made it easier for the prosecution to obtain a second degree murder conviction by stating that he did not intend to kill the victim, thereby making section 246.3 available as a predicate offense. The Attorney General replied: "If the [defendant] had not offered these statements to the police and had not opened this avenue up to the prosecutor, there would have been one less theory for culpability. . . . That was a bed [defendant] made and he must now lie in it."

Defendant's jury was instructed on first degree murder, second degree murder based on express and implied malice, second degree felony murder based on violation of section 246.3, and voluntary manslaughter. (Maj. opn., *ante*, at p. 164.) Without the felony-murder theory and instruction, the prosecution in this case would have had to prove, and the jury would have had to find, that defendant acted with malice. (See *People v. Dillon, supra,* 34 Cal.3d at p. 475 ["In every case of murder other than felony murder the prosecution undoubtedly has the burden of proving malice as an element of the crime."].) But that was unnecessary in this case because of the commission of the predicate felony. The prosecution, thus, was essentially relieved of the burden to prove malice because, ironically, defendant maintained that he did not intend to kill the victims. Having done so, he also precluded available defenses based on lack of malice because the issue of malice is irrelevant in a felony-murder case. (*Patterson, supra,* 49 Cal.3d at p. 626.)

I am not fully convinced prosecutors should be permitted to use, or even need, this backdoor route to secure a second degree murder conviction. As noted above, commentators have observed " 'It may be that the rule is unnecessary in almost all cases in which it is applied, that is to say, that conviction in those cases can be predicated on the normal rules as to murder . . . .' " (*People v. Satchell, supra,* 6 Cal.3d at p. 33, fn. 11, quoting Packer, *The Case for Revision of the Penal Code* (1961) 13 Stan. L.Rev. 252, 259.) In other words, " 'If the defendant commits the felony in a highly reckless

manner, he can be convicted of second degree murder independently of the shortcut of the felony-murder rule.' " (*Satchell,* at p. 34, fn. 11, quoting Note (1967) 55 Cal. L.Rev. 329, 340.)

In most cases involving a felony-murder theory, prosecutors should have little difficulty proving second degree murder with implied malice. "[M]alice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]." (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666]; maj. opn., *ante,* at p. 164.) Eliminating second degree felony murder from the prosecution's arsenal would not have a detrimental effect on the prosecution's ability to secure second degree murder convictions, but it would go a long way to restoring the proper balance between culpability and punishment.

Unlike Justice Brown, I concur in the majority opinion because, as stated at the outset, the refusal to apply the merger doctrine to the predicate offense in this case is correct given the current state of the law. Defendant neither challenges the second degree murder doctrine nor the fact that the predicate offense of willfully discharging a firearm in a grossly negligent manner is inherently dangerous. The subject of my concurrence, the continued viability of the second degree felony-murder rule, was neither briefed nor argued in this court, so I have not reached a firm conclusion on this issue, but I write to express my reservations about the doctrine and intention to examine it closely when the issue is clearly raised and briefed in this court.

**KENNARD, J.,** Dissenting.—Under the second degree felony-murder rule, a defendant who kills in the commission of a felony that is inherently dangerous to life is guilty of second degree murder, even if the killing is accidental. But the rule applies only if the underlying felony is committed for a felonious purpose independent of the homicide (*People v. Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193]); it does not apply to a felony that "is an integral part of" and "included *in fact* within" the killing (*People v. Ireland* (1969) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580]; see also *People v. Hansen* (1994) 9 Cal.4th 300, 312 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*)).

Here, defendant shot and killed a man who had been trying to steal hubcaps from defendant's car. Defendant claimed he was merely trying to scare the man and did not intend to actually shoot him. The majority holds that the second degree felony-murder rule applies because the killing occurred during an inherently dangerous felony, namely, discharging a firearm

with gross negligence (Pen. Code, § 246.3),[1] and defendant's claimed objective to scare the victim was an independent felonious purpose. Discharging a firearm with gross negligence is indeed an inherently dangerous felony. But I disagree that defendant acted with a felonious purpose that was *independent of* the killing.

## I

On the night of December 27, 1998, Kehinde Riley, Ricky Harris, Bradley Gentry, and Lamont Benton parked their car near defendant's apartment in Oakland. Riley and Harris began to steal the hubcaps from defendant's car, which was parked outside. When defendant came out of his apartment, Gentry and Benton drove off, while Riley and Harris ran. Benton saw defendant fire shots from his porch, and he heard more shots as he drove away. A neighbor saw defendant stand in the center of the road in a "firing stance" and shoot straight ahead. Harris was shot in the foot; Riley was shot in the back of the head and killed. His body was found about 50 yards from where the shots were fired.

Defendant, a 25-year-old man with no criminal record, claimed he did not shoot straight ahead, instead aiming the gun at a 45-degree angle above the victim's head, intending to scare the thieves. He presented expert testimony by a psychologist that he suffered from posttraumatic stress disorder after being shot six months earlier in a "road rage" incident.[2] As a result of this incident, defendant had become reclusive, fearful, and easily startled, causing him to overreact to threatening situations. A firearms instructor testified that persons who are inexperienced with firearms tend to hit below their point of aim, thereby supporting defendant's claim that he was aiming over the thieves' heads when he shot. Defendant also presented evidence of his nonviolent character.

The trial court instructed the jury on first and second degree murder, and on voluntary manslaughter. As to second degree murder, it instructed the jury on killing with express malice (CALJIC No. 8.30), on killing with implied malice (CALJIC No. 8.31), and on felony murder (CALJIC No. 8.32) arising from defendant's alleged commission of the crime of grossly negligent discharge of a firearm. After deliberating for six days, the jury convicted defendant of the second degree murder of Riley; it also convicted him of assaulting Harris with a deadly weapon. The Court of Appeal concluded the trial court's instruction on second degree felony murder was wrong, because

---

[1] All further statutory citations are to the Penal Code.

[2] Defendant was a passenger in a car that was involved in an accident; after an argument about who was at fault, the driver of the other car pulled a gun and shot defendant.

the crime of grossly negligent discharge of a firearm "merged" into the killing, but it found the error harmless.

## II

At issue here is the "merger" exception to the second degree felony-murder rule.[3] That exception was first articulated by this court in *People v. Ireland, supra*, 70 Cal.2d 522. In that case, the defendant shot and killed his wife. The couple's six-year-old daughter testified that just before the shooting her parents were talking about which of them was going to move out, and that after her father shot her mother he sat down, rocking back and forth and crying, until the neighbors arrived. At the defendant's murder trial, the trial court instructed the jury that if the defendant killed his wife while committing an assault with a deadly weapon he was guilty of second degree murder; the jury convicted the defendant of that crime.

We reversed the defendant's conviction, explaining: "We have concluded that the utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule 'beyond any rational function that it is designed to serve.' [Citation.] To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*People v. Ireland, supra*, 70 Cal.2d at p. 539, fn. omitted.)

Two years later, this court in *People v. Mattison, supra*, 4 Cal.3d 177, elaborated on the *Ireland* merger exception. In *Mattison*, the defendant prisoner sold another inmate an alcoholic substance that caused the latter's death. The trial court instructed the jury it could convict the defendant of second degree murder under the second degree felony-murder rule, based on his violation of a statute making it a felony to put poison in a drink with the intent to injure (§ 347). We upheld the conviction, explaining that the rule was inapplicable because, unlike *Ireland*, "the underlying felony was committed with a '*collateral and independent felonious design.*' " (*Mattison, supra*, 4 Cal.3d at p. 185, italics added.) We quoted with approval a passage from *People v. Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697], in which the Court of Appeal upheld a defendant's conviction under the second degree

---

[3] For convenience, I call this the "*Ireland* merger exception."

felony-murder rule based on furnishing the victim with the heroin that caused his demise: " 'While the felony-murder rule can hardly be much of a deterrent to a defendant who has decided to assault his victim with a deadly weapon, it seems obvious that in the situation presented in the case at bar, it does serve a rational purpose: knowledge that the death of a person to whom heroin is furnished may result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing.' " (*Mattison, supra*, at p. 185.)

More recently, in *Hansen, supra*, 9 Cal.4th 300, a bare four-to-three majority of this court said *Mattison*'s independent felonious purpose test should not be "the critical test determinative of merger in all cases" (*id.* at p. 315), asserting that this test was "somewhat artificial" and could "lead to an anomalous result" (*ibid.*). Instead, the majority "focus[ed] upon the principles and rationale underlying . . . *Taylor*[, *supra*, 11 Cal.App.3d 57 [89 Cal.Rptr. 697]], namely, that with respect to certain inherently dangerous felonies, their use as the predicate felony supporting application of the felony-murder rule will not elevate all felonious assaults to murder or otherwise subvert the legislative intent." (*Hansen, supra*, 9 Cal.4th at p. 315.) Applying this amorphous "test," the *Hansen* majority concluded that the *Ireland* merger exception did not apply to the crime of shooting at an inhabited dwelling.

I dissented. Applying the independent felonious purpose test, I concluded that the *Ireland* merger exception barred application of the second degree felony-murder rule in *Hansen*. The evidence, I said, "did not show that [the] defendant had any independent felonious purpose for discharging the firearm at the . . . residence." (*Hansen, supra*, 9 Cal.4th at p. 330 (dis. opn. of Kennard, J.).)

In this case, the majority, without explanation, abandons the rationale of the *Hansen* majority, and it returns to the independent felonious purpose standard, which it had criticized in *Hansen, supra*, 9 Cal.4th 300. Good. For that was the test I urged the *Hansen* majority to apply, to no avail. Alas, the majority here misapplies that test, concluding that defendant had a felonious purpose independent of the killing. He did not, as I explain below.

## III

According to the majority, defendant's claimed purpose to scare the victim by shooting at him was a felonious purpose independent of the killing. Under that rationale, defendant would have been better off had he testified to firing at the victim *intending to hit him*, because then the second degree felony-murder rule would not apply. In so construing the *Ireland* merger exception,

the majority has twisted traditional concepts of criminal law. After today's decision, prosecutors will try to obtain murder convictions by arguing that defendants *lacked an intent to kill*, while defense attorneys, to prevent their clients from being convicted of murder, will be compelled to argue that their clients *intended to kill*. I cite two examples to illustrate the point.

1. Patricia is confronted at her home by her former boyfriend John, who has for many years abused her physically. John looks angry. Unreasonably believing that John is about to assault her and that she must protect herself, Patricia pulls a gun from a nearby drawer and fires a shot that hits and kills John. If Patricia shot John *intentionally,* she is guilty not of murder but of the lesser crime of *voluntary manslaughter*, because she acted in " 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense . . . ." (*People v. Blakeley* (2000) 23 Cal.4th 82, 88 [96 Cal.Rptr.2d 451, 999 P.2d 675].) But, under the majority's holding today, if Patricia intended only to scare John, she is guilty of the more serious crime of *second degree murder* under the felony-murder rule, because she violated section 246.3 by discharging a firearm with gross negligence and she had an independent felonious purpose—namely, to scare John.

2. During an argument with a close friend, Cornelia, in Cornelia's kitchen, Derek admits that he recently raped Cornelia's teenage daughter at gunpoint. Infuriated, Cornelia takes a gun from a kitchen cabinet and, as Derek backs up in fear, fires a shot that ricochets off a metal pot and strikes Derek in the chest, killing him. When questioned by the police, Cornelia says she wanted to make Derek experience a fear similar to that Cornelia's daughter must have felt when Derek raped her at gunpoint. Under the majority's approach, if Cornelia's account of her motive is true she is guilty of second degree murder, because she had an independent felonious purpose—to make Derek feel fear—and she violated section 246.3 (discharging a firearm with gross negligence) when she fired the fatal shot. But if Cornelia truly intended to shoot Derek, she would be guilty only of voluntary manslaughter, because she killed him in a "sudden quarrel or heat of passion." (§ 192.)

Ordinarily, defense counsel tries to portray the defendant as someone with a *less* culpable mental state, while the prosecutor tries to portray the defendant as having a *more* culpable mental state. But under the majority's decision today, these positions will be reversed—oddly so—whenever the defendant is charged with fatally shooting the victim and, as in the two examples given above, the defense claims either unreasonable self-defense or heat of passion. One can imagine this future closing argument by defense counsel: "Ladies and gentlemen of the jury, the prosecutor has told you that my client was simply trying to scare the victim when he shot her. What utter nonsense! The evidence clearly shows that my client's only desire was to end

the victim's life when he fired the fatal shot." Surely not an argument to the client's liking or calculated to evoke the jury's sympathy, but one that is compelled under the majority's holding.

Here, defense counsel argued to the jury that defendant fired the gun only to scare, not to kill, victim Riley. The prosecutor, by contrast, argued that defendant intended to kill Riley when he fired the fatal shot. Under the majority's holding, the prosecutor should have argued that defendant was only trying to scare Riley. Defense counsel, by contrast, should have argued that defendant was trying to injure or kill Riley, because only if defendant intended to shoot Riley could counsel contend that defendant killed him in unreasonable self-defense, and therefore was guilty not of murder, but only of voluntary manslaughter.

A defendant who kills in the heat of passion or in unreasonable self-defense lacks malice, and thus is not guilty of murder but only of voluntary manslaughter. Under the second degree felony-murder rule, however, the prosecution need not prove malice, and therefore heat of passion and unreasonable self-defense are irrelevant. This is not a problem with any other felony to which the second degree felony-murder rule has been held to apply, because none of those offenses is committed in the heat of passion or in unreasonable self-defense.[4] But, unlike those other felonies, violations of section 246.3 (discharging a firearm with gross negligence) that result in fatalities can be committed by defendants with either of those two mental states. By holding that the second degree felony-murder rule applies to violations of section 246.3, the majority undermines the Legislature's determination that homicides committed in the heat of passion or in unreasonable self-defense are not murder but voluntary manslaughter.

Also, the majority's holding that a violation of section 246.3 may form the basis for a conviction under the second degree felony-murder rule is inconsistent with the rule that to prove felony murder the prosecution must show that the defendant had "the specific intent to commit the underlying felony."

---

[4] Courts have held that murder convictions can be based on the second degree felony-murder rule when the underlying felony is shooting at an inhabited dwelling (*Hansen, supra,* 9 Cal.4th at p. 316), manufacturing methamphetamine (*People v. James* (1998) 62 Cal.App.4th 244, 257–271 [74 Cal.Rptr.2d 7]), reckless or malicious possession of a destructive device (*People v. Morse* (1992) 2 Cal.App.4th 620, 646 [3 Cal.Rptr.2d 343]), kidnapping (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 377 [68 Cal.Rptr.2d 61]; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1298 [280 Cal.Rptr. 584]), poisoning with intent to injure (*People v. Mattison, supra,* 4 Cal.3d at pp. 184–186), and arson of a motor vehicle (*People v. Nichols* (1970) 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673]; but see *People v. Henderson* (1977) 19 Cal.3d 86, 96 [137 Cal.Rptr. 1, 560 P.2d 1180] [possibly disapproving *Nichols*]). In *People v. Howard,* S108353,* this court will decide whether the second degree felony-murder rule applies to the crime of driving in willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer. (Veh. Code, § 2800.2.)

(*People v. Hart* (1999) 20 Cal.4th 546, 608 [85 Cal.Rptr.2d 132, 976 P.2d 683]; see also *People v. Nichols, supra,* 3 Cal.3d at p. 163.) One wonders how a defendant could be said to have the *specific intent* to violate a statute that, like section 246.3, prohibits *grossly negligent* conduct. Grossly negligent conduct is highly careless or reckless, but it is not intentional. What is it that the defendant in the situation just described must specifically intend to do? The majority does not say.

The majority is wrong in treating defendant's alleged intent to scare the victim as a felonious intent independent of the killing. An intent to scare is neither independent nor felonious.

An intent to scare a person by shooting at the person is *not independent* of the homicide because it is, in essence, nothing more than the intent required for an assault, which is not considered an independent felonious purpose. (See generally *People v. Williams* (2001) 26 Cal.4th 779 [111 Cal.Rptr.2d 114, 29 P.3d 197] [discussing the mental state required for an assault].) Two examples of independent felonious purpose come to mind: (1) When the felony underlying the homicide is manufacturing methamphetamine, the intent to manufacture this illegal drug is a felonious intent that is independent of the homicide, thus allowing the manufacturer to be convicted of murder if the methamphetamine laboratory explodes and kills an innocent bystander. (2) When the underlying felony is possession of a destructive device, the intent to possess that device is an independent felonious intent, allowing the possessor to be convicted of murder if the device accidentally explodes, killing an unintended victim. But when, as here, a defendant fires a gun to scare the victim, the intended harm—that of scaring the victim—is not independent of the greater harm that occurs when a shot fired with the intent to scare instead results in the victim's death.

Nor can an intent to scare a person properly be described as *felonious,* because an intent to frighten is not an element of section 246.3, which requires only that the defendant discharge a firearm with gross negligence. To prove a violation of section 246.3, the defendant's intent is irrelevant. Thus, when the jury in this case was instructed on the elements of section 246.3, it was *not* told—properly so—to decide whether defendant shot Riley with the intent to scare him. In sum, it makes no sense legally to treat defendant's alleged intent to scare as "felonious" when such an intent is legally irrelevant and when the jury never decided whether he had that intent.

## IV

For the reasons given above, I conclude, as the Court of Appeal did, that the trial court erred in telling the jury it could convict defendant under the

second degree felony-murder rule based on section 246.3's prohibition against discharging a firearm with gross negligence. But unlike the Court of Appeal, I find the error prejudicial.

The trial court's erroneous instruction on the second degree felony-murder rule violated the federal Constitution because it misstated the elements of second degree murder, allowing the jury to convict defendant of that crime without having to decide whether he acted with malice when he fired the shot that killed Kehinde Riley. The error requires reversal unless the reviewing court can say beyond a reasonable doubt that the error was harmless. (*Neder v. United States* (1999) 527 U.S. 1, 15–20 [144 L.Ed.2d 35, 119 S.Ct. 1827].)

In finding the error harmless, the Court of Appeal here reasoned that the jury implicitly found that defendant acted with malice in firing at the two fleeing thieves (Riley and Harris) when it convicted him of assault with a deadly weapon on Harris. Thus, the Court of Appeal said, the jury necessarily found that defendant acted with malice when he shot Riley, killing him. I disagree.

A person who kills in the heat of passion or in unreasonable self-defense lacks malice and is therefore guilty not of murder, but only of voluntary manslaughter. No court, however, has ever held that either heat of passion or unreasonable self-defense is a defense to the crime of assault with a deadly weapon. Thus, the jury here did not implicitly find that defendant acted with malice when it convicted him of assault with a deadly weapon on Harris, because it could have found defendant guilty of that crime even if it believed he fired in the heat of passion arising from his discovery of the thieves stealing his hubcaps, or that he fired in the unreasonable belief that he had to shoot at the thieves to protect himself. As a result, the court's instruction on the second degree felony-murder rule was prejudicial error.[5]

CONCLUSION

I would reverse the judgment of the Court of Appeal, and I would remand with directions to reverse defendant's murder conviction.

**WERDEGAR, J.,** Dissenting.—I respectfully dissent. Reluctantly, I conclude the merger doctrine (*People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr.

---

[5] The dissenting opinions of Justice Werdegar and Brown and the concurring opinion of Justice Moreno suggest that this court should reconsider the validity of the second degree felony-murder rule. In light of my conclusion that defendant's conviction should be reversed in any event, and because the issue was not raised in the parties' briefs or at oral argument, I express no view on this issue.

188, 450 P.2d 580]) that limits second degree felony murder must be understood to preclude the offense of grossly negligent discharge of a firearm (Pen. Code, § 246.3) from serving as a predicate felony under the circumstances of this case. As Justice Kennard demonstrates (dis. opn. of Kennard, J., *ante*, at p. 184), moreover, we cannot be certain beyond a reasonable doubt (*Neder v. United States* (1999) 527 U.S. 1 [144 L.Ed.2d 35, 119 S.Ct. 1827]) that the jury did not rely on felony-murder instructions to convict defendant of second degree murder; defendant's conviction should therefore be reversed.

Concurring separately in *People v. Hansen* (1994) 9 Cal.4th 300, 317–318 [36 Cal.Rptr.2d 609, 885 P.2d 1022], I endorsed the "collateral and independent felonious design" test of *People v. Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193], and opined that the defendant's intent to "intimidate" another was sufficiently independent of the killing to avoid the merger doctrine in that case. The majority in this case, making a commendable effort to straighten out a fairly twisted piece of doctrine (see dis. opn. of Brown, J., *post*, at pp. 186–188), returns to the *Mattison* test the court seemingly abandoned in *Hansen*, *supra*, 9 Cal.4th at page 315, and reasons that defendant's claimed intent merely to scare the thieves away was collateral to the resulting homicide. (Maj. opn., *ante*, at p. 171.)

I would like to join in the majority reasoning, which is consistent with my *Hansen* concurrence. But sometimes consistency must yield to a better understanding of the developing law. The anomalies created when assaultive conduct is used as the predicate for a second degree felony-murder theory (see dis. opn. of Kennard, J., *ante*, at pp. 180–182) are too stark and potentially too productive of injustice to be written off as "characteristic of the second degree felony-murder rule in general" (maj. opn., *ante*, at p. 173). It simply cannot be the law that a defendant who shot the victim with the intent to kill or injure, but can show he or she acted in unreasonable self-defense, may be convicted of only voluntary manslaughter, whereas a defendant who shot only to scare the victim is precluded from raising that partial defense and is strictly liable as a murderer. The independent and collateral purposes referred to in *Mattison* must be understood as limited to nonassaultive conduct. In circumstances like the present, the merger doctrine should preclude presentation of a second degree felony-murder theory to the jury.

Justices Brown (dis. opn., *post*, at pp. 191–192) and Moreno (conc. opn., *ante*, at pp. 175–176) question both the foundations of and need in the criminal law for a nonstatutory second degree felony-murder rule and suggest it may be ripe for reexamination, as Justice Panelli (*People v. Patterson* (1989) 49 Cal.3d 615, 641–642 [262 Cal.Rptr. 195, 778 P.2d 549] (conc. &

dis. opn.)) and Chief Justice Bird (*People v. Burroughs* (1984) 35 Cal.3d 824, 852–854 [201 Cal.Rptr. 319, 678 P.2d 894] (conc. opn.)) have done in the past. I agree and for these reasons would also apply the rule narrowly so as not to create an unnecessary divergence between culpability and punishment.

**BROWN, J.,** Dissenting.—As H. G. Wells's nameless protagonist trenchantly observed, "the peculiar sensations of time traveling . . . are excessively unpleasant . . . a feeling . . . of a helpless headlong motion!" (H. G. Wells, The Time Machine (1986 ed.).) A court trying to decipher our periodic attempts to tame the " 'anachronistic' " (*People v. Burroughs* (1984) 35 Cal.3d 824, 829 [201 Cal.Rptr. 319, 678 P.2d 894], overruled on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82 [96 Cal.Rptr.2d 451, 999 P.2d 675]), artificial (*People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130]), and "disfavored" (*People v. Henderson* (1977) 19 Cal.3d 86, 92 [137 Cal.Rptr. 1, 560 P.2d 1180], overruled on another ground by *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869]) second degree felony-murder rule could be forgiven for thinking the experience eerily reminiscent of Wells's description of time travel. Since we are changing the rules yet again, and the application of the collateral and independent felonious design test in a case like this one can only make a bad situation worse, I dissent.

The second degree felony-murder rule has been part of California law for more than a century and this court has described its function in terms which seem admirably precise: "The [second degree] felony-murder rule operates . . . to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of *all* felonies inherently dangerous to human life . . . ." (*People v. Ireland* (1969) 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580].)

In practice, however, the precision of this verbal formulation is more apparent than real. It requires the court to determine both how the predicate felony is to be defined and what threshold of dangerousness is sufficient. Even when a court agrees to look at the elements of the felony in the abstract, i.e., whether the commission of the crime as defined by the statute poses a danger to human life (*People v. Patterson* (1989) 49 Cal.3d 615, 622 [262 Cal.Rptr. 195, 778 P.2d 549]), reasonable judges can disagree about the legitimacy of contracting or expanding the statutory definition of a felony in order to conclude that a particular violation should be deemed inherently dangerous. (*Id.* at pp. 631–632 (conc. & dis. opn. of Mosk, J.).) Though we have been preternaturally aware of the danger of widening the second degree felony-murder rule "beyond calculation" by fragmenting a defendant's course of conduct so that the "rule applies if any segment of [the defendant's] conduct may be considered dangerous to life" (*People v. Phillips* (1966) 64 Cal.2d 574, 583–584 [51 Cal.Rptr. 225, 414 P.2d 353]), we have not always

been able to resist the temptation to "embark on . . . 'an uncharted sea of felony murder.' " (*Patterson*, at p. 631 (conc. & dis. opn. of Mosk, J.).)

Moreover, which felonies are inherently dangerous to human life is not self-evident. When a homicide results, it is clear that, in the particular circumstances, the predicate felony was dangerous to human life, but that does not tell us whether it should be deemed so in the abstract. (See, e.g., *People v. Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372] [since Pen. Code, § 4532, relating to escape, draws no relevant distinction between sneaking away and killing a guard to obtain a key, it proscribes an offense, which considered in the abstract, is not inherently dangerous to human life]; *People v. Henderson, supra*, 19 Cal.3d 86 [predicate felony of false imprisonment, viewed as a whole in the abstract, is not inherently dangerous to human life]; but see *People v. Patterson, supra*, 49 Cal.3d 615, 624–625 [the fact that Health & Saf. Code, § 11352 includes a variety of offenses does not preclude the court from determining that the "primary element" of furnishing a dangerous drug is inherently dangerous].)

Nor does the phrase "inherently dangerous" tell us exactly how dangerous a felony has to be to justify obviating the malice requirement. Over time, the court has shifted from a standard that only required a showing that the predicate felony posed an inherent danger to human life (*People v. Poindexter* (1958) 51 Cal.2d 142 [330 P.2d 763]), to one requiring that the predicate felony involve "a substantial risk that someone will be killed" (*People v. Burroughs, supra*, 35 Cal.3d at p. 833), and then to a more recent position that an act is "inherently dangerous" to human life when there is a high probability that it will result in death (*People v. Hansen* (1994) 9 Cal.4th 300, 309 [36 Cal.Rptr.2d 609, 885 P.2d 1022]; *People v. Patterson, supra*, 49 Cal.3d at p. 627). In this case, the majority cites both standards, reasoning that a high probability does not mean a greater than 50 percent chance. (Maj. opn., *ante*, at p. 167.)

We are even unable to decide, once and for all, what is the purpose of the second degree felony-murder rule. We have said the purpose of the rule is simply to deter persons engaged in felonies from killing negligently or accidentally. (*People v. Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361], overruled on other grounds in *People v. Flood, supra*, 18 Cal.4th 470.) But, we have also intimated that the objective is to deter the commission of the underlying felonies. (*People v. Hansen, supra*, 9 Cal.4th at p. 310.) Perhaps as a result of this ambiguity of purpose, we have found it difficult to articulate a generally applicable merger rule. The merger doctrine as originally conceived in *Ireland* precluded application of the second degree felony-murder rule where the evidence showed the underlying felony was an integral part of and included *in fact* within the resulting homicide. (*People v.*

*Ireland, supra*, 70 Cal.2d at p. 539.) Again, this is a formulation that results in a clear rule when an assault with a deadly weapon causes the death of the target of the assault. But how ought we to address questions of causation and malice when the defendant's intent is more ambiguous and the homicide results from reckless, negligent, or accidental conduct?

The majority opinion goes back in time and applies the " 'collateral and independent felonious design' " test we set forth over three decades ago in *People v. Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193]. Mattison was a prison inmate who violated Penal Code section 347 (felony poisoning) by providing jail-made hooch to a fellow inmate. The concoction was primarily, if not entirely, methyl alcohol—a deadly poison when ingested in large quantities. Mattison was not trying to poison anyone; he furnished the alcohol for personal gain. He argued that the offense of administering poison with the intent to injure was an integral part of and included in fact within the offense of murder by poison. We concluded that application of the felony-murder rule was proper because the predicate felony was committed with a " 'collateral and independent felonious design.' " (*Mattison*, at p. 185.) For the purposes of the merger doctrine, our decision in *Mattison* relied on the Court of Appeal's opinion in *People v. Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697]. What the majority fails to point out is that we examined *Mattison* and *Taylor* in *People v. Hansen, supra*, 9 Cal.4th 300—our last in-depth look at the merger doctrine—and expressly rejected the test the majority applies today: We stated, "We decline, however, to adopt as the critical test determinative of merger in all cases the following language that appears in *Taylor*, quoting a decision of a New York court: that the rationale for the merger doctrine does not encompass a felony ' "committed with a collateral and independent felonious design." ' [Citations.] Under such a test, a felon who acts with a purpose other than specifically to inflict injury upon someone—for example, with the intent to sell narcotics for financial gain, or to discharge a firearm at a building solely to intimidate the occupants—is subject to greater criminal liability for an act resulting in death than a person who actually intends to injure the person of the victim." (*Hansen*, at p. 315.) Rather than rely on that somewhat artificial test, the court focused on not subverting legislative intent. (*Ibid.*) Therefore, in reaching our holding in *Hansen* that the merger doctrine did not apply to a felony-murder conviction based upon the crime of discharging a weapon into an inhabited building, we sought to avoid elevating "all felonious assaults to murder." (*Id.* at p. 315.)

Today, the majority already appears to be hedging its bets on the future application of the collateral and independent felonious design test by acknowledging that it has "drawbacks" and limiting its application to this particular case. (Maj. opn., *ante*, at p. 171 ["Although the collateral purpose rationale *may have its drawbacks in some situations* (*Hansen*,

*supra*, 9 Cal.4th at p. 315), we believe it provides the most appropriate framework to determine whether, *under the facts of the present case*, the trial court properly instructed the jury" (italics added)].)

The most important question, however, remains unaddressed. Why? What purpose does the second degree felony-murder rule serve that justifies the fitful and erratic course of our jurisprudence? The ad hoc and post hoc nature of our deliberations suggests the doctrine is either doing too much or accomplishing nothing at all.

There is a problem with the subversion of legislative intent rationale, with its focus on quantitative assessment, which we invoke in tandem with whatever rule we decide to apply. As the Court of Appeal below stated: "The crux of the matter under *Hansen*—subversion of legislative intent—is a function . . . of the percentage of total homicides that result from the felonious conduct in question. Since the felony-murder rule eliminates the element of malice otherwise required for murder under the statutory scheme for punishment of homicides, and since, for example, the 'great majority' of homicides occur in the 'context of assault' [citation], allowing felonious assaults to serve as predicates for felony murder would 'usurp most of the law of homicide' [citation] in derogation of legislative intent. Thus, the critical fact in *Hansen* was that 'most homicides do not result from violations of [Penal Code] section 246.' "

In this case, the majority repeats the catechism once again: "[T]he *Ireland* rule was intended to avoid elevating every felonious assault that ends in death to second degree murder, a result that would 'usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice afore-thought, and therefore punishable as manslaughter).' [Citation.]" (Maj. opn., *ante*, at p. 170.)

Presumably this means that the second degree felony-murder doctrine should be applied to all inherently dangerous felonies that do not include malice as an element unless application of the doctrine would include too great a percentage of *all* homicides. This analysis begins with a non sequitur from which it never recovers. The merger doctrine applied in this fashion actually ensures the Legislature's careful calibration of culpability will be ignored in precisely those cases where the absence of malice is a critical issue. Thus, in cases involving intentional assaults—where there will likely

be evidence of premeditation *and* malice—the People must prove every element of the crime. In cases where evidence of malice is likely to be absent or highly equivocal, the second degree felony-murder rule makes proof of malice unnecessary and imposes murder liability for what might otherwise be manslaughter. It takes no genius to discern that a rule that relieves the People of the need to prove malice *because* the defendant asserts he did not harbor any is problematic. This is the problem we hinted at in *Hansen* and then obscured in our quantitative analysis.

We cannot avoid "subverting the legislative intent" by speculating—futilely and undoubtedly inaccurately—about how many homicides are committed in what way. This is the legal equivalent of the theological debate about how many angels can dance on the head of a pin. Our answer will be irrelevant. The problem is: second degree felony murder as an unconstrained, nonstatutory outlier is incompatible with the idea of careful gradations of liability. The cases in which these gradations will matter are the singular, morally ambiguous, and unusual cases.

In this case, for example, defendant claimed he fired his gun to frighten away people who were stealing equipment from his vehicle while it was parked in front of his home. Even after being given the second degree felony-murder instruction, the jury took six days to find the defendant guilty of murder. Similarly, in *Hansen,* the defendant expressed his anger at someone who had stolen $40 from him during an attempt to buy drugs by firing multiple shots at the thief's apartment—which he believed was unoccupied. Tragically, two children were in the apartment, and one of them was killed. (*People v. Hansen, supra,* 9 Cal.4th at pp. 305–306.) That jury, too, took six days to reach a verdict, and, in statements reprised in Justice Mosk's dissent, strongly criticized the application of the felony-murder rule, complaining that the law dictated a result the jurors might otherwise have rejected because they thought he had done something very serious but " 'would not rank him as a cold-blooded killer.' " (*Id.* at p. 322, fn. 4.) Therefore, in both cases, although the results are tragic, even the judges of this court could not agree the defendants' conduct should be deemed so reprehensible that strict liability is justified.

The Court of Appeal staggers valiantly through a welter of statistics, concludes that a violation of Penal Code section 246.3 could be charged whenever a gun is intentionally fired and a death results, and, heaving a sigh after all that heavy lifting, gamely concludes that "to preserve malice as an issue in most homicide cases in accordance with legislative intent, we hold the merger doctrine precludes a violation of [Penal Code] section 246.3 from serving as a predicate offense for a charge of felony murder." The analysis is not compelling, but the motivation is commendable.

There should not be any nonstatutory crimes in California. (Pen. Code, § 6.) Certainly there should be none that thwart specific legislative authorizations. It is not enough to congratulate ourselves that the Legislature has allowed us to do so with impunity. It would be remarkable if the Legislature understood the implications of a doctrine we ourselves cannot satisfactorily explain. It is long past time for us to stop sending the appellate courts on these bootless expeditions to try to quantify homicides. To the extent second degree felony murder imposes strict liability where dangerously reckless conduct would otherwise be inadequately punished and insufficiently deterred, there may be a class of cases to which it should be applied. Presumably, the Legislature is capable of defining what conduct falls in that category. In his dissenting opinion in *Patterson*, Justice Panelli stated, "Although courts are often called upon to make policy choices—and this court has not shirked its responsibility to do so—our mandate to make policy in this context is not particularly strong. . . . [¶] . . . [¶] . . . Since the rule permits a court to increase the punishment for certain dangerous crimes, the temptation to invoke it is great when we are facing . . . social [crises] . . . . I respectfully suggest that it is the Legislature that has the resources and constitutional authority to determine and define what conduct is criminal and to set the punishment for such crimes." (*People v. Patterson, supra*, 49 Cal.3d 615, 641–642 (conc. & dis. opn. of Panelli, J.).)

Justice Panelli's thoughts were echoed by Justice Mosk: "Equally important is 'the need for legislative attention to the second degree felony-murder rule' (*People v. Patterson* (1989) 49 Cal.3d 615, 641 [262 Cal.Rptr. 195, 778 P.2d 549]), . . . an artificial concept of strict criminal liability that ' "erodes the relationship between criminal liability and moral culpability." ' (*People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130]; *People v. Satchell* (1971) 6 Cal.3d 28, 33 [98 Cal.Rptr. 33, 489 P.2d 1361].)" (*In re Christian S.* (1994) 7 Cal.4th 768, 785 [30 Cal.Rptr.2d 33, 872 P.2d 574] (conc. opn. of Mosk, J.).)

Because the second degree felony-murder rule is suspect I believe it would not be missed if we abandoned it. "The abrogation of the common law second degree felony-murder rule would not change the result in the majority of homicide cases. [Citation.] In cases other than first degree felony murders, malice would remain the essential distinguishing element of murder. [Citations.] As in the past, malice would be established in one of two ways: (1) when the accused 'manifest[s] a deliberate intention unlawfully to take away the life of a fellow creature' [citation], or (2) when he (a) commits an act which is likely to cause death, and (b) consciously and unjustifiably disregards the substantial probability that death will result. [Citations.] . . . [¶] If the trier of fact found malice . . . section 187 would, as in the past, classify the killing as murder. In such a situation, a killing which occurs in the course of any inherently dangerous felony not enumerated in Penal Code section 189

would be murder in the second degree. [¶] No longer would a killing which occurs during the commission of an inherently dangerous felony, standing alone, constitute second degree murder. However, one should not conclude that when death ensues in such a situation, the commission of a dangerous felony is an irrelevant factor in determining whether or not the defendant acted with malice. To the contrary, the circumstances of the crime including the commission of the felony may provide strong circumstantial evidence that the defendant intended to kill the victim or that he committed an act in conscious disregard of the substantial probability that death would result. [Citation.]" (*People v. Burroughs, supra*, 35 Cal.3d 824, 852–853 (conc. opn. of Bird, C. J.).)

Therefore, I respectfully dissent.