65 Cal.Rptr.3d 481 (2007)
154 Cal.App.4th 1290
The PEOPLE, Plaintiff and Respondent,
v.
Jessie Jose RAMIREZ, Defendant and Appellant.
No. F050212.
Court of Appeal of California, Fifth District.
September 5, 2007.
*482 Joseph C. Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Brian Alvarez, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
WISEMAN, Acting P.J.
Immediately after police announced themselves outside defendant Jessie Jose Ramirez's apartment and one officer knocked on a window, defendant fired a shotgun through the window from inside. The blast narrowly missed the officer. A standoff ensued during which defendant fired through his windows several more times while his wife and child were in the apartment with him. Finally, he surrendered to police. He was convicted of numerous charges, including attempted deliberate and premeditated murder of a police officer, and was sentenced to 30 years and four months in prison, plus a consecutive term of 15 years to life.
Among other things, defendant argues on appeal that there was insufficient evidence of deliberation and premeditation and that the trial court improperly admitted evidence of his statement several years earlier that he would kill a police officer if necessary to avoid prison. We conclude there is no prejudicial error and affirm the judgment.
We publish our discussion of one issue: whether negligent discharge of a firearm (Pen.Code, § 246.3) is a lesser offense necessarily included in firing at an inhabited dwelling (Pen.Code, § 246). Disagreeing with People v. Overman (2005) 126 Cal. App.4th 1344, 24 Cal.Rptr.3d 798, we hold that it is not.

FACTUAL AND PROCEDURAL HISTORIES
Several Chowchilla police officers responded to a call claiming that a man was holding a gun to a woman's head inside an apartment. Outside the apartment, Officer Brian Esteves yelled, "police department, occupants ... please come out of the residence with your hands up." When no one responded, another officer, Sergeant David Noblett, knocked on a front window. Immediately, a shotgun blast came through the window on which the officer had knocked. The officer was not shot, but felt the compression of the blast, was sprinkled with the shattered glass, and fell backward. He got up and took cover behind *483 a car. Between two and six more shots then came through the same window.
Defendant's wife emerged from the apartment carrying their five-year-old daughter. Officers asked her to come over to them, but she went back into the apartment with the child. A second volley of shotgun blaststwo or three shotsthen came through the same window. Some additional shots came out a back window.
The officers again ordered the occupants of the apartment to come out. Defendant's wife again emerged, set the child on the ground, told her to go to the officers, and went back inside. The Chowchilla police chief was on the scene; he left his position of cover, picked up the child, and ran back.
A third volley of two to five shots followed. Defendant's wife emerged from the apartment a third time and told the officers that defendant had put his gun down. Defendant then came out with his hands up. He followed the officers' order to lie on the ground and said, "I am your man, the gun's on the couch." The officers arrested him. At some point during these events police threw or fired tear gas canisters into the apartment.
The district attorney filed an 18-count information. The following table lists the charges and enhancement allegations:

COUNT OFFENSE PEN.CODE§ ENHANCEMENT PEN.CODE §
 1 Attempted deliberate 187;664 Personal use of a firearm; 12022.5, subd.
 and premeditated subds. (a) & personal and intentional (a); 12022.53,
 murder of Noblett, a (e) discharge of subds. (b) &
 police officer a firearm; committing (c); 186.22,
 offense to benefit a subd. (b)(1)
 criminal street gang
 2 Assault with a firearm 245, subd. Personal use of a firearm; 12022.5,
 upon Noblett, a police (d)(1) personal and intentional subds. (a) &
 officer discharge of (d); 12022.53,
 a firearm; committing subds. (b) &
 offense to benefit a (c); 186.22,
 criminal street gang subd. (b)(1)
 3 Discharging a firearm 246 Committing offense to 186.22, subd.
 at 131 Kings Avenue, benefit a criminal (b)(1)
 an inhabited dwelling street gang
 4 Discharging a firearm 246 Committing offense to 186.22, subd.
 at 129 Kings Avenue, benefit a criminal (b)(1)
 an inhabited dwelling street gang
 5 Discharging a firearm 246 Committing offense to 186.22, subd.
 at 130 Kings Avenue, benefit a criminal (b)(1)
 an inhabited dwelling street gang
 6-15 Grossly negligent discharge 246.3 Committing offense to 186.22, subd.
 of a firearm benefit a criminal (b)(1)
 street gang
 16 Being a felon in possession 12021, subd. Committing offense to 186.22, subd.
 of a firearm (a)(1) benefit a criminal (b)(1)
 street gang
 17 Child endangerment 273a, subd.
 (a)
 18 Active participation in 186.22,
 a criminal street gang subd. (a)

*484 At trial, officers recalled details of the shot that narrowly missed Sergeant Noblett. Jay Varney, the police chief, testified that the blinds or curtains were closed behind the window on which Noblett knocked and he could not see inside. Varney said the shots came "almost directly out of the window where [Noblett] was knocking." Noblett himself said, "[T]he gunshots came out where I knocked and my face was about 12 inches to 18 inches from where the gunshots came out." Officer Esteves agreed that the shot "hit pretty much where [Noblett] knocked." He thought that the first volley of shots was directed at the officers because the broken glass flew toward them and the curtains came through the broken window in their direction.
There was some inconsistency in the police testimony about what Noblett did just before he knocked. Officer Esteves "believe[d]" Noblett "yelled police department" before knocking. Officer Mandrell also "believe[d] [Noblett] said police department." Noblett's own account, however, did not include this detail:
"Q Did anyone address the residents] of that apartment in any way?
"A Officer Esteves made an announcement for the occupants to come outside and advised we were the police.
"Q Was there any reaction to that?
"A No.
"Q What, if anything, did you do once there's no reaction from the inside?
"A I moved to the southwest corner of the front window and knocked on the window. And before I did anything else, gunshots came out the front window."
Defendant testified that, although he fired through the window after hearing the police announce themselves and after hearing the knock, he was not shooting at the officers and did not intend to harm them. He claimed he heard Noblett's voice "coming from the corner of the house" rather than from the front and that "to my knowledge, I thought no one was behind that window." He could not see the officers because the blinds were closed. He said he "lost [his] cool" and only fired "[t]o back them off, back them away." Defendant's wife testified that defendant stood in the hallway and fired toward the front of the house, not aiming at anything in particular.
To explain what motivated his behavior, defendant testified that he was depressed. His plan was to use all his shells but one and then kill himself with the last. His answer when asked why he needed to fire many shots before killing himself was that he "wanted time to get [his] family out" and "didn't want to see [his] wife." His wife testified that she walked out of the apartment at his instruction.
Defendant testified about two causes of his depression. First, he had just been laid off from a construction company job after seven or eight months, the longest he had ever continuously been employed. He had moved with his family from Madera to Chowchilla to escape gang life and had obtained this job to start making an honest living; the loss of it caused him to feel inadequate as a provider. Second, he had a conflict with his wife that day. Two days earlier, which was defendant's birthday, he had left the house and stayed out for more than a day. Defendant's wife was angry and retaliated on the day of the incident by telling defendant she had been to the hospital and learned that her five-month pregnancy had miscarried. Defendant believed his disappearance on his birthday and his wife's resulting emotional state had caused the miscarriage. In reality, defendant's wife had been to the hospital, but had not miscarried. Defendant learned the truth *485 from his mother by telephone during the standoff.
The prosecution presented evidence that pellets from the shotgun blasts struck neighboring apartments. The address of defendant's apartment was 139 Kings Avenue. It was in an apartment complex called Kings Court. Kenny Bishop lived with his wife, mother-in-law, sister-in-law, and eight-month-old daughter in the same complex in an apartment of which the address was 129 Kings Avenue; it was described at trial as catty-corner from defendant's apartment. Bishop heard the police arrive and then heard at least eight gunshots. A projectile or slug, described by a police witness as a one-ounce piece of metal fired from a shotgun shell, entered Bishop's apartment. It pierced three walls inside the apartment and ricocheted off a medicine cabinet and a bathroom door. One witness said the bedroom where the daughter was sleeping at the time was "right in the pathway" of the projectile.
Humberto Hernandez testified that he lived in the apartment at 131 Kings Avenue with his wife and brother-in-law. This apartment was described by a police witness as "directly across from" defendant's apartment. Hernandez heard the shots. Pellets from one of them broke through a window of his apartment and struck the living room wall. The three occupants took cover in the bathroom. The brother-in-law was struck near his eyebrow by a shotgun pellet or a fragment of a shotgun pellet. He was not seriously injured.
According to a police witness, the apartment at 130 North Second Street[1] was also damaged by one of the shotgun blasts. An officer testified that he evacuated the row of apartments in which this one was included, but did not get the names of those evacuated and did not know whether people were inside each individual apartment. The prosecution also presented evidence of damage from the shotgun blasts to the windows, front door, furniture, and appliances inside defendant's apartment. Nine spent buckshot shells, one spent slug shell, and four live shells were found on the floor.
The prosecution presented evidence that defendant had been a member of the Sureño gang Vatos Locos Mexicanos, which the police gang expert described as the most violent gang in Madera County. Defendant had gang tattoos on his hands. He had admitted to being a gang member on several occasions when he was taken into custody, beginning in 1996 or 1998 and continuing to the time of his booking on the current offenses. In the past he had worn gang clothing and associated with people known to be gang members. Defendant was "very well known" as a gang member to the Madera police and Madera County juvenile authorities, having been a gang member since he was 14 or 15 years old. His gang moniker was Bones. He once told a detective he would like to have a son become a member of his gang. He participated with other gang members in the flooding of jail cells and was involved in a gang meeting while in jail.
The police gang expert testified that the current offenses were committed for the benefit of or in association with the gang because gang members "gain respect" by "committing crimes[,] specifically violent acts." Killing a police officer would have given defendant "the highest status" within the gang. Further, the commission of violent crimes by members of a gang "gives that gang higher status" and causes *486 witnesses to other gang crimes to be afraid to testify about them.
Reading from a 1999 police report, the gang expert testified about an interview defendant gave Madera police in connection with a homicide. The report said defendant "stated that the only thing that protected law enforcement, protected police officers ... was a bullet proof vest. He wouldif it tookif it went down to going to jail, he would kill a police officer."
This statement was admitted over defendant's objection. The court overruled the objection and issued a limiting instruction, telling the jury that the statement was "not offered as evidence of the truth of the matter asserted" and that the jury should not "use it for any other purpose than [its] evaluation of the testimony of the expert. The court later gave a similar instruction covering all the underlying conduct upon which the expert based his opinion about defendant's gang membership.
Defendant testified that he had been a gang member in Madera but had dropped out and not been a member since he moved to Chowchilla in 2003 or 2004. He said he "[f]igured that was the best choice for me and my wife to just move out of there. I went, told my friends well, I said you know what, that's it. I am moving away. I am going to start a new life with my family, my girl, little girl."
The jury found defendant guilty as charged on counts 1 through 17. It found him not guilty on count 18, the gang-membership charge. It found all the enhancement allegations true, except the gang-enhancement allegations, which it found not true.
On count 1, attempted deliberate and premeditated murder of a police officer, the trial court sentenced defendant to 15 years to life. It added a 20-year enhancement for personal and intentional discharge of a firearm. It imposed a consecutive sentence of seven years (the upper term) on count 3, discharging a firearm at 131 Kings Avenue, and two consecutive sentences of one year and eight months (one-third of the middle term) on counts 4 and 5, discharging a firearm at 129 Kings Avenue and 130 Kings Avenue. Upper terms for count 2, assault with a firearm on a police officer, and counts 6 through 9, grossly negligent discharge of a firearm, were imposed and stayed pursuant to Penal Code section 654.[2] Concurrent upper terms were imposed for counts 10 through 15, grossly negligent discharge of a firearm, count 16, being a felon in possession of a firearm, and count 17, child endangerment.

DISCUSSION

I.-III.[**]

IV. Lesser-included offenses
Defendant points out that, while only 10 spent shells were found in his apartment, he was convicted of 10 counts of negligent discharge (counts 6 through 15) plus three counts of firing at an inhabited dwelling (counts 3 through 5). He claims that negligent discharge is a lesser offense necessarily included in firing at an inhabited dwelling. Multiple convictions of greater and necessarily included lesser offenses are not permitted. (People v. Pearson (1986) 42 Cal.3d 351, 355, 228 Cal. Rptr. 509, 721 P.2d 595.) Defendant argues that the 10 shots constituted a maximum of 10 acts, so the maximum combined number of allowable convictions for negligent discharge and firing at an inhabited dwelling is 10. He concludes that three of *487 the negligent-discharge convictions therefore must be reversed. We disagree. Negligent discharge is not necessarily included in firing at an inhabited dwelling.
California courts have employed two tests, the elements test and the accusatory pleading test, to identify necessarily included offenses. "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (People v. Birks (1998) 19 Cal.4th 108, 117, 77 Cal. Rptr.2d 848, 960 P.2d 1073.) In People v. Reed (2006) 38 Cal.4th 1224, 1227-1230, 45 Cal.Rptr.3d 353, 137 P.3d 184, however, the Supreme Court held that only the elements test may be used in determining whether one offense is necessarily included in another for purposes of applying the Pearson rule against multiple convictions.
Section 246.3, subdivision (a), defines the offense of negligently discharging a firearm:
"Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment in the state prison."
People v. Clem (2000) 78 Cal.App.4th 346, 350, 92 Cal.Rptr.2d 727, enumerated the elements of this offense as follows: "`(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person.'"
Section 246 defines the offense of firing at an inhabited dwelling: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house ... is guilty of a felony....[¶] As used in this section, `inhabited' means currently being used for dwelling purposes, whether occupied or not."
The crucial difference for purposes of the lesser-included-offense analysis is that firing at an inhabited dwelling does not require any possibility of causing the injury or death of a person. Unlike section 246, section 246.3 "`presupposes that there are people in harm's way...."' (People v. Robertson (2004) 34 Cal.4th 156, 169, 17 Cal.Rptr.3d 604, 95 P.3d 872.) Consequently, it is possible to commit the offense of firing at an inhabited dwelling without committing a grossly negligent discharge of a firearm. One element of the latterthe possibility of killing or injuring a personis not required for the former. A perpetrator would be guilty of firing at an inhabited dwelling if he intentionally shot an inhabited house in an isolated area after ascertaining that no one was home and no one was nearby. By the same token, he or she might not under these same circumstances be guilty of negligent discharge of a firearm because there might be no possibility of injuring or killing a person.
Defendant relies on People v. Overman, supra, 126 Cal.App.4th 1344, 24 Cal. Rptr.3d 798, which applied the elements test and held that negligent discharge of a firearm is necessarily included in firing at an inhabited dwelling. We conclude that Overman was wrongly decided and decline to follow it.
In Overman, the defendant argued that the trial court erred by refusing to instruct the jury on negligent discharge of a firearm as a lesser-included offense of firing at an inhabited dwelling. (People v. Overman, supra, 126 Cal.App.4th at p. 1358, 24 Cal.Rptr.3d 798.) The Court of Appeal *488 agreed. It noted that a possibility of killing or injuring a person is an element of negligent discharge, but believed that such a possibility is' also generally involved in firing at an occupied dwelling.
"When a defendant shoots at an inhabited dwelling house, occupied building, or other target listed in section 246, the defendant discharges a firearm in a manner that has the potential for culminating in personal injury or death. Shooting at an inhabited dwelling house, for example, whether occupied or not, necessarily poses a significant likelihood or `high probability' that personal injury or death will result, because people '"are generally in or around the premises." ' [Citation.] The same significant risk of personal injury or death is present when a defendant shoots at any other target listed in section 246." (People v. Overman, supra, 126 Cal.App.4th at pp. 1361-1362, 24 Cal.Rptr.3d 798.)
We respectfully conclude that this reasoning is mistaken. It is true that people generally are in or around inhabited dwellings, but this does not mean that shooting at one necessarily poses a significant likelihood of injuring or killing a person. It is possible to shoot at an inhabited dwelling within the meaning of the statute without creating any likelihood of injuring or killing a person because sometimes people are not in or around a particular inhabited dwelling. This means that a chance of injuring or killing a person is not an element of the offense and, therefore, it is possible to shoot at an inhabited dwelling within the meaning of section 246 without negligently discharging a firearm within the meaning of section 246.3.

V. Sentencing issues[***]

DISPOSITION
The judgment is affirmed.
WE CONCUR: GOMES and HILL, JJ.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, III, and V of the Discussion.
[1] This is the apartment the information referred to as 130 Kings Avenue. It was in the Kings Court complex, facing the cross street.
[2] Subsequent statutory references are to the Penal Code.
[**] See footnote *, ante.
[***] See footnote *, ante.