Filed 1/4/21  P. v. Brink CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERRY EDWARD BRINK,<br><br>Defendant and Appellant. | C086561<br><br>(Super. Ct. No. MCYK-CRBF-2016-40) |

Someone savagely beat Kristopher McCraw to death on Christmas Eve in 2015. Michael Moore testified that the murder was committed by his half-brother, defendant Jerry Edward Brink.  Moore recounted that defendant repeatedly kicked the victim with such force that "you could hear things breaking" and that Moore believed defendant would kill the victim if the beating continued.[1]  Defendant testified on his own behalf and

---

[1]    Moore testified against defendant after pleading guilty to involuntary manslaughter, assault by means of force likely to result in great bodily injury, and first

1

blamed the fatal beating on Moore. A jury convicted defendant of second degree murder (Pen. Code, §§ 187, 189, subd. (b)),[2] first degree burglary (§ 459), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). The jury, however, left blank the verdict forms alleging the special circumstances that a person other than an accomplice was present in the residence during the burglary and that defendant personally inflicted great bodily injury on the victim. The trial court sentenced defendant to a term of 15 years to life for the murder plus 6 years for the burglary and 4 years for the assault. The trial court stayed the sentences for burglary and assault under section 654. The trial court also imposed various fines and fees.

On appeal, defendant contends (1) the trial court erred in instructing the jury that it could convict him of second degree murder based on the felony-murder rule premised on assault by means of force likely to produce great bodily injury, (2) the trial court's jury instructions were further erroneous because Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 2) abrogated the natural and probable consequences theory of murder for a person who is not the actual killer and the evidence in the record does not show that defendant was convicted on any legally valid theory, (3) the trial court's failure to conduct an ability-to-pay hearing requires this court to strike his $10,000 restitution fine (§ 1202.4, subd. (b)), $120 court operations fee (§ 1465.8), and $90 court facilities fee (Gov. Code, § 70373), and (4) the abstract of judgment must be corrected to reflect that he was convicted of first degree burglary in count 3 and that the sentence for assault by means likely to produce great bodily injury was ordered stayed under section 654.

The Attorney General concedes that the trial court erred in instructing the jury on felony murder based on an assaultive felony, but argues that the instructional error was

---

degree burglary in exchange for a sentence of up to six years and the understanding that Moore would testify truthfully against defendant.

[2] Undesignated statutory references are to the Penal Code.

2

harmless beyond a reasonable doubt.  The Attorney General also concedes that the abstract of judgment should be corrected to conform with the sentence imposed by the trial court.

We conclude that the trial court erred in instructing the jury that it could rely on assault by means of force likely to cause great bodily injury to convict defendant of murder based on the felony-murder rule.  The instructional error was prejudicial because the record does not establish beyond a reasonable doubt that the jury relied on a valid theory when it convicted defendant of second degree murder.  Because defendant does not challenge the sufficiency of the evidence in support of his convictions, there is no impediment to remanding this matter to give the People 30 days to elect to retry defendant on the murder charge.  Our conclusion that the judgment must be reversed obviates the need to consider defendant's remaining claims.  Accordingly, we reverse and remand.

## BACKGROUND

### *Prosecution Evidence*

Daniel Effman testified that in December 2015 he lived in Happy Camp, California, about a thousand feet away from the home of McCraw.  Effman was good friends with defendant, whom he called by the nickname "Rabbit."  By contrast, he knew Moore "[n]ot well at all."  On Christmas Eve in 2015, defendant and his half-brother, Moore, unexpectedly arrived at Effman's house sometime after 10:00 p.m.  Defendant and Moore stayed for about three hours, during which time they drank alcohol with Effman.  They also talked to Effman's aunt "about Native American things."  Defendant and Moore were happy.  Defendant played his guitar and sang.

Effman did not like that McCraw was selling drugs in the neighborhood. Effman's son was on drugs and would buy his drugs from McCraw.  Although Effman reported McCraw's drug dealing to the drug task force at the sheriff's office, law

3

enforcement took no action. Effman had heard that there had been a "drug-rip off" involving Moore and McCraw that resulted in Moore losing between $1,000 and $3,000.

Effman was interviewed several times by the police in regard to McCraw's death, but at trial denied making many of the earlier statements. The prosecution called Siskiyou County Sheriff's Department Detective Jesus Fernandez, who testified that he interviewed Effman on January 5, 2016. On that occasion, Effman said that defendant and Moore arrived at his house on Christmas Eve "drunk and partying." Effman further stated that Moore was involved in drug activity and was owed money by McCraw. Defendant and Moore "said they were looking to get into some kind of physical altercation." Effman recounted that defendant and Moore "went over to pretty much beat [McCraw] up and they overdid it."

Raymond Myers testified that he was hanging out at McCraw's house on Christmas Eve in 2015. Myers had been using methamphetamine and alcohol. That evening, defendant and Moore showed up and knocked on the door. McCraw let them in. Defendant, Moore, and Myers wished each other a merry Christmas. Moore told Myers, "Just don't get excited with what happens in the next few minutes." Myers went to sit back down. Moore told Myers, ". . . I don't want to fight you. I will shoot you right where you're at." At the time, Myers did not understand what Moore meant. Myers testified that Moore and McCraw "had a confrontation, and I guess all hell broke loose." Myers did not see much of what happened because he was "tied up" with Moore. "Blows were exchanged" between defendant and McCraw. The fight might have lasted a half-hour and drew to an end when defendant did an "Indian hip flip top" on McCraw. Myers explained that "after [defendant] did that, it was over with."

Myers testified that Moore did not participate in the fight. At one point during the fight, Moore tried to pull defendant off of McCraw. Moore told defendant, "that's enough." At another point, Moore told defendant, "he's not going to win." Defendant smiled and continued fighting. To Moore, it appeared that defendant was in "a snap stage

4

where your mind snaps. You don't care." Moore "gathered [defendant] up." Defendant was exhausted and nauseated. Myers told Moore that "if they needed anything, [he] would be up at Lester's . . . ." Everyone knew "the code of the river." The "code of the river" was that you "[d]on't give a pregnant girl a loaded dope pipe." Three weeks earlier, Myers saw McCraw violate the code by giving Effman's pregnant granddaughter drugs. Myers considered it a "Christmas present" that someone stood up for the code of the river after McCraw had violated it. Myers saw that McCraw was still alive when Moore and defendant left. Myers smoked a cigarette, put wood into the fire stove, and left McCraw's house.

When initially questioned by the police, Myers refused to answer any questions. Myers believed it was "okay for people to take the law into their own hands." The police brought Moore to Myers, and Moore gave Myers permission to tell the truth. Myers then told the police that he did not see who threw the first punch. Defendant hit McCraw more than 10 times. McCraw had "had his head kicked in." Moore yelled at defendant: "Hey, bro, he's had enough, you know, let him go or knock it off." Myers saw that McCraw was dead. As Moore left, he told Myers to remember "the code of the river." Myers told the police that the code of the river meant that "if you snitch, you wind up in the river."

Moore testified that he and his family went to visit his mother's house around noon on Christmas Eve in 2015. While there, Moore called defendant to ask if he and his family wanted to spend Christmas Eve with Moore and his family. Moore went to pick up defendant. Defendant was having a conflict with his girlfriend, so Moore and defendant went to their mother's house. Moore gave defendant a special gift, a new guitar. Moore and defendant played music, reminisced, and talked about "what was happening with the tribe." After dinner, Moore and defendant began drinking rum and coffee. Together they consumed two bottles of rum.

5

Around 10:00 p.m., Moore took defendant to his house but defendant's girlfriend did not want him there. Defendant and Moore decided to go see Effman, who Moore considered to be a longtime friend. At Effman's house, they drank more alcohol, defendant played his guitar, and they all "had a pretty good time." Because it was hot inside the house, defendant took off his shirt. Defendant "started acting . . . stupid." Moore testified that defendant "started talking about, I'm a savage warrior, and we need to do this and do that with the tribe." At some point, the topic turned to Effman's neighbor, McCraw. Effman said, "[McCraw]'s just doing the same old shit." Moore responded, "Burning people and ripping people off all the time?" McCraw was "just a problem in general." As defendant started getting "cocky," Moore decided it was time to go home.

As Moore and defendant pulled out of Effman's driveway, Moore saw McCraw's light on and asked defendant if he wanted to stop at McCraw's house. At first, defendant did not want to stop. But then after being asked again by Moore, defendant said, "Yeah, pull in there." They got out of the car, defendant with his guitar. Moore got to the door first because defendant turned around and put his guitar into the car. McCraw let them both inside. Moore greeted Myers and asked why he was not at his brother's house. Myers responded that he did not want to be in the way after all of his brother's children showed up for Christmas. Myers was sitting on a bench that had been taken out of a school bus. Moore heard defendant say, "Get the fuck away from here. Get the fuck off me." Myers said, "What the fuck?" Moore told him, "I don't know. Stay out of this. It's none of our business. Let them deal with it." At that point, defendant and McCraw started knocking things over. Moore told them, "You guys really going to do this right now? It's Christmas Eve. Come on, knock it off." McCraw held defendant by his shirt, and defendant pushed McCraw into a wall. Moore thought they were only going to exchange words. Moore then told them, "Okay, well, do what you guys got to do then. Fucking deal with it." The fight "got real serious after that." McCraw did or said

6

something and Moore found himself yelling at his brother to stop. Moore told McCraw to get out of the front door so that defendant and Moore could leave. Moore got between McCraw and defendant. Defendant stomped on Moore's hand. Moore got hit in the head – most likely by Myers. Moore went down for a few seconds.

Defendant kicked McCraw and landed "some pretty hard hits." McCraw kicked back and defendant aggravated a prior rib injury. McCraw ended up on the floor in the fetal position. Defendant "not only flew off the handle, he became enraged like [Moore had] never seen him before." Defendant was in such an "intense frame of mind" that it scared Moore. The fight "was so out of control" that Moore thought defendant might kill McCraw. McCraw was leaning on his elbow and moaning when Moore and defendant were ready to leave. Moore had to move McCraw out of the way so that they could leave. Moore was scared and knew that McCraw was hurt. Moore had previously told an investigator and his attorney that McCraw was lying motionlessly.

Moore acknowledged that he was testifying as part of a plea deal in which he agreed to testify during defendant's trial in exchange for a six-year prison term based on his admission of assault by means of force likely to cause great bodily injury, involuntary manslaughter, and first degree burglary.

Dr. James Olson works as a forensic pathologist. Dr. Olson performed the autopsy on McCraw on January 4, 2016. A body scan of McCraw had already been completed. The scan showed that McCraw's body had multiple fractured bones – including a complete fracture of his jawbone, a broken nose, and fractured maxillary bone. McCraw's entire face was bruised as well as his forehead. The left ear was severely injured, almost torn off. McCraw had three lacerations in the upper lip. There were areas of bruising on both sides of the lower rib cage that were associated with several rib fractures. McCraw had injuries on his arms and hands that "appeared most likely to be part of defensive injuries." Dr. Olson determined that the cause of death had been multiple blunt force injuries to the head. McCraw's injuries were most likely caused by

7

kicking. Dr. Olson could not determine how long after being beaten that McCraw lived, noting that "[h]e may have actually lingered for a while in a coma and then died or he may have died fairly quickly." If McCraw had lingered, he would not have been conscious or able to render any assistance to himself.

James Williams sold firewood to McCraw on a monthly basis. On December 29, 2015, Williams went to McCraw's house to bring him some firewood. Williams approached McCraw's house after sunset and found it to be completely unlighted. Williams retrieved a flashlight and looked inside to see McCraw's body lying on the floor. Williams went straight home and told his girlfriend that McCraw had been beaten to death. Williams's girlfriend called the police. Siskiyou County Sheriff's Department Lieutenant Behr Tharsing and Deputy Welch were dispatched to McCraw's residence. The officers found McCraw's body lying approximately four feet from the entrance. There was "lots of blood" on and around McCraw's body, causing Lieutenant Tharsing to believe there had been a struggle.

Siskiyou County Sheriff's Department Detective Jesus Fernandez testified that he interviewed defendant on January 5, 2016. Defendant said that he had visited his family for the holidays but had not gone out in the late hours on Christmas Eve. Another detective who was present during the interview asked how defendant would account for his fingerprints being at the crime scene. Defendant said "basically he didn't know exactly what we're talking about" and that he did not know McCraw. Defendant added that he had never been to McCraw's house. Defendant and Moore were both arrested for McCraw's death on January 8, 2016.

## Defense Evidence

The defense called Moore's wife, Sheona Moore, as a witness.[3] Sheona had attempted to divorce Moore but the process was not successfully completed, and she needed to start it again. In 2015, Sheona experienced difficulties in her household due to suspected drug use by Moore. After Moore was arrested, Sheona cleaned out his room and found "needles and baggies." Sheona knew "about a situation wherein [Moore] lost money to Kris McCraw concerning medical marijuana." On Christmas morning 2015, Sheona observed that Moore had an injury on his hand that "looked like a boxer split" that is a "split between your knuckles when you've been fighting or punching a wall . . . ." Sheona asked about the injury and Moore told her "several different things" about having gotten cut on a piece of tin at Effman's house. Moore later went to the hospital to seek treatment after the cut became painful and swelled.

Sheona explained that one of Moore's legs is shorter than the other due to surgery. Although Moore attended defendant's trial with the use of a cane, Sheona stated that he did not need it. Moore was also capable of kicking, and had actually kicked Sheona during an argument. Moore threw punches at Sheona and she hit back. Moore then "picked up his leg and kicked [her]."

Defendant testified on his own behalf as follows: Around 2:00 p.m. on Christmas Eve in 2015, Moore picked up defendant and they went to their mother's house. Over the course of the day, defendant and Moore drank two bottles of rum. At some point in the evening, Sheona was supposed to take defendant home. Defendant and Moore kept playing music instead. Sheona's baby became fussy, and Moore assumed the task of driving defendant home. Moore announced they would "make a few laps" by driving

---

[3]     For the sake of clarity and due to a surname shared with Michael Moore, we refer to Sheona by her first name.

around their small town, Happy Camp. They ended up going to Effman's house around 9:30 p.m. Moore and defendant played music at his house. They drank a variety of alcoholic drinks and defendant became more intoxicated. They talked about tribal issues, construction, and defendant's job working with fisheries. They did not discuss McCraw, who defendant did not know. Defendant was unaware of a drug deal between Moore and McCraw that had gone badly.

Moore and defendant left Effman's residence and drove off. Moore unexpectedly pulled up to what looked to defendant like a shack or a shed. Defendant grabbed his guitar because he assumed "it was going to be a break for me to stop and play guitar . . . before we headed back home." Moore told defendant to put the guitar away. Moore entered and the door nearly closed behind him. Defendant saw Myers and another person he did not know. That person turned out to be McCraw.

Once inside, defendant said something like, "[H]i, how are you doing, bro?" and "something smart-mouthed . . . about the place." The comment was "about it being cluttered and it smelled real bad." McCraw took offense and they "got in each other's face." Defendant backed up and McCraw took a swing at him. Defendant grabbed McCraw and they both fell on a table before "kicking and flailing like a couple cats . . . ." Moore was standing to the side. Defendant and McCraw got back up. Defendant testified that he did not do "that much damage" to McCraw because it was just "a scuffle." Defendant was certain he did not cause the injuries shown by the autopsy photos.

Moore several times told defendant, "Kick his ass, bro." Defendant and McCraw ended up on the ground again – flailing, kicking, and punching each other. After a minute, Moore tried to break up the fight. Moore punched McCraw several times. Neither defendant nor McCraw was able to get the upper hand. "At some point," Moore said: "Get the F out of here." McCraw did a "double kick" at Moore from the ground.

10

Moore pushed defendant out the door but did not follow defendant to the car. McCraw was still moving when defendant left the residence. Defendant was "spinning" from intoxication. He got into the car where he passed out while waiting for Moore. After three or four minutes, defendant woke up when Moore nudged him. Defendant did not know what happened between Moore and McCraw after defendant left the residence. Defendant and Moore never talked about what happened after Moore remained in the house with McCraw.

Moore drove to Charlie Brown's house even though defendant did not want to go there. Moore and defendant went inside and defendant passed out. Early the next morning, Moore and defendant returned to their mother's house.

### *Rebuttal Evidence*

The prosecution introduced the testimony of Keturah Greeno. Greeno testified that her longtime friends, Moore and defendant, arrived unexpectedly at Brown's house in the early morning hours on Christmas Day. She noticed that Moore "had a lot of blood on his hands." Both defendant and Moore also had blood on their clothes and boots. Her brother later told her that Moore and defendant "had blood all over their hands and feet." Although she had known defendant all of her life, she did not initially recognize defendant because he "looked like he was in shock of some sort."

## DISCUSSION

## I

### *Second Degree Felony Murder Based on an Assaultive Felony*

Defendant argues that the trial court engaged in prejudicial error when it instructed the jury that it could convict defendant of murder under the felony-murder rule based on assault by means of force likely to cause great bodily injury. The Attorney General agrees that the trial court erred in instructing the jury on felony murder but argues that the

11

error was harmless beyond a reasonable doubt.  We conclude that the murder conviction must be reversed.

## A.

### *Felony-murder Rule Theory of the Case and Jury Instruction*

In urging the jury to convict defendant of murder, the prosecutor advanced multiple theories of liability – including felony murder premised on the charged felony of assault by means of force likely to cause great bodily injury.  During closing argument, the prosecutor told the jury:  "I think you'll find you're spending probably – almost all your time with first degree murder because as you'll see when we get into felony murder, you're going to actually have to read the instructions on burglary and assault with force likely to even be able to apply that type of murder.  So that's the way we charged it."

The prosecutor further argued that "you're going to look at when the defendant committed the act, was – in the course of committing a particular felony.  So if you're committing an assault on somebody with force likely to cause great bodily injury, you don't mean to kill them, but while you're doing that felony, somebody dies – or even two people are doing it, kicking at someone, and while they're doing it, somebody dies, then you're guilty because you were committing a felony."  The prosecutor expressly noted that the jury could convict defendant of second degree murder based on the felony-murder rule:

"And then there's second degree felony murder.  [¶]  If you decide that the defendants – that [defendant] went over there to beat up severely Kristopher McCraw, assault him with force likely to cause great bodily injury, didn't mean to kill him, but he went over there to assault him and he got out of hand and he kicked him to death, then it becomes second degree felony murder."

12

The trial court instructed the jury on murder with malice aforethought. (CALCRIM No. 520.) The jury was also instructed with CALCRIM No. 541A on second degree felony murder, in pertinent part, as follows:

"The defendant is charged in Count one with murder, under a theory of felony murder.

"To prove that the defendant is guilty of second degree murder under this theory, the People must prove that:

"1. The defendant committed assault with force likely to produce great bodily injury;

"2. The defendant intended to commit assault with force likely to produce great bodily injury;

"AND

"3. The defendant did an act that caused the death of another person;

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

"To decide whether the defendant committed assault with force likely to produce great bodily injury, please refer to the separate instructions I have given you on that crime."

At sentencing, the trial court considered defendant's motion to stay the sentences for first degree burglary and assault by means of deadly force. (§ 654.) During its consideration of the issue, the trial court noted that the jury received "instructions as to the felony murder rule for second-degree murder. The first defendant allegedly committed the fatal act and the second coparticipant fatally committed – or excuse me, allegedly committed the fatal act." The trial court elaborated:

"There were two people who were codefendants, [defendant] and Mr. Moore. Taking all of this together, *it is very possible that the jury found [defendant] murder – guilty of murder by virtue of the felony murder rule.* Rather than having necessarily

13

committed the fatal act himself.  [¶]  In other words, they could have believed that Mr. Moore committed the blows that actually killed Mr. McCraw.  By virtue of the entry into the property and the participation in an assault on Mr. McCraw that [defendant] committed an act of burglary.  [¶]  The Court I believe must look to the proposition that is most favorable to the defendant in this case.  And that would be that he was convicted pursuant to the felony murder rule not necessarily because he actually committed the fatal act."  (Italics added.)

The prosecutor responded by urging the trial court not to attempt to discern the theory on which jurors relied in convicting defendant of second degree murder.  The prosecutor remarked:  "I don't think that the Court should assume what the jurors decided as far as their theory of murder.  They don't have to agree on any theory of murder.  There's four different theories of murder at least that were considered by the jury in this case and they don't have to agree unanimously.  [¶]  And I think regardless of whether you know even if there was felon[y] murder, you still have different acts that were committed by this defendant. . . .  He went in with perhaps not an intent to kill Mr. McCraw but with an intent to commit assault with force likely."

The trial court found that the evidence at trial could be construed so "that the burglary, *the assault, are part and parcel of the felony murder* and therefore both required to be stayed" under section 654.  (Italics added.)

**B.**

### *Felony Murder Premised on an Assaultive Felony*

The California Supreme Court has explained, " '[s]econd degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder.' "  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*), quoting *People v. Hansen* (1994) 9 Cal.4th 300, 307.)  The element of malice for second degree murder

14

may be express or implied. (*Chun,* at p. 1181.) Implied malice murder occurs "when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) The second degree felony-murder rule has arisen to supply the implied malice element based on proof of " 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189. . . .' " (*Chun*, at p. 1182, quoting *People v. Robertson* (2004) 34 Cal.4th 156, 164.)

The *Chun* court limited the types of felonies that can support second degree felony murder. (*Chun, supra*, 45 Cal.4th at p. 1200.) The Supreme Court announced that "[w]hen the underlying felony is assaultive in nature, such as a violation of section 246 [(shooting at an inhabited dwelling house)] or 246.3 [(discharging a firearm in a grossly negligent manner)], we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An 'assaultive' felony is one that involves a threat of immediate violent injury." (*Ibid*.)

In excluding assaultive felonies from those that can support a second degree felony-murder conviction, the *Chun* court reasoned: " 'To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged.' " (*Chun, supra*, 45 Cal.4th at p. 1189, fn. omitted, quoting *People v. Ireland* (1969) 70 Cal.2d 522, 539.)

Here, the trial court erroneously instructed the jury that an assaultive felony – i.e., assault by means of force likely to cause great bodily injury – could serve a basis for

second degree felony murder. The charge of assault by means of force likely to cause great bodily injury was an integral part of the homicide in this case in which McCraw was beaten to death. Defendant's second degree murder conviction may not rest on an application of the felony-murder rule premised on assault by means of force likely to cause great bodily injury.

## C.

### *Prejudice*

As a fundamental rule of appellate review, we may not reverse a judgment even if we conclude that the trial court erred unless we also determine that the error was prejudicial. "California Constitution, article VI, section 13, prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial. Accordingly, we must decide whether the error in instructing on felony murder prejudiced defendant. [¶] Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*Chun*, *supra*, 45 Cal.4th at p. 1201.) "In this situation, to find the error harmless, a reviewing court must conclude, beyond a reasonable doubt, that the jury based its verdict on a legally valid theory, i.e., either express or conscious-disregard-for-life malice." (*Id.* at p. 1203.)

The *Chun* court's holding that instructional error involving felony murder based on an assaultive felony integral to the homicide must be reversed unless harmless beyond a reasonable doubt was confirmed in *People v. Aledamat* (2019) 8 Cal.5th 1. In *Aledamat*, the Supreme Court held "that alternative-theory error is subject to the more general *Chapman* harmless error test.[4] The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all

---

**4**    *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].

16

relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.)

In this case, we are unable to declare the instructional error harmless beyond a reasonable doubt because the record does not establish that jurors relied on a valid theory of murder instead of the felony-murder theory based on an assaultive felony. The prosecutor's closing argument indicated that she believed the jury would most likely rely on felony murder when she anticipated jurors would spend almost all their time considering felony murder – albeit on the charge of first degree murder. The jury signaled that felony murder based on an assaultive felony was a possibility in that it convicted defendant of assault by means of force likely to result in great bodily injury. The evidence at trial unequivocally showed that McCraw was beaten to death. The trial court's comments at sentencing confirmed that the evidence supported a finding that the assault was "part and parcel of the felony murder" so that the assault by means of force likely to cause great bodily injury had to be stayed under section 654. The evidence in the record combined with the jury instructions on second degree felony murder preclude a determination that the jury did not rely on the assault by means of force likely to cause great bodily injury to convict defendant of second degree felony murder.

The Attorney General asserts the instructional error was harmless because "any rational jury would have convicted [defendant] of second degree murder based on either an implied malice theory or natural and probable consequences theory." Defendant's jury was instructed on implied malice murder and natural and probable consequences murder.[5] The Attorney General musters facts that rely primarily on the testimony of

---

[5] Our conclusion that the murder conviction must be reversed due to instructional error relating to felony murder based on an assaultive felony obviates the need to consider defendant's additional claims of instructional error, including an assertion that Senate Bill No. 1437 (2017-2018 Reg. Sess.) also rendered the trial court's instructions on the natural and probable consequences doctrine erroneous as well.

17

Moore and Myers to assert that defendant stomped McCraw to death in arguing that the jury necessarily relied on a conscious-disregard-for-life theory of implied malice murder. The record, however, does not support the argument that defendant's murder conviction was necessarily based on conscious disregard for life.

As noted above, the prosecutor's own statements to the jury indicated that she expected jurors to rely on a felony-murder theory to convict defendant of murder. Moreover, the facts of the case allowed the jury to convict defendant of second degree murder by finding that defendant assaulted McCraw but that it was Moore who dealt the final and fatal blows. By all accounts, it was Moore's decision to visit McCraw on the evening of the murder. Moore had lost a substantial amount of money to McCraw. Defendant appeared to have thought the visit was social in that he initially brought his guitar out of the car. Moore told him to put the guitar back. And, it was Moore who immediately told Myers to ignore what was going to happen over the next few minutes – Moore's statement being made before the fight started.

The jury could well have believed that defendant assaulted McCraw but that McCraw was still up and alive when defendant was pushed out of the residence by Moore. Except for aggravating a prior injury to his ribs, defendant did not appear hurt. Moore, however, had a "boxer split" that was serious enough to require eventual medical attention. After the murder, Moore's boots had blood on them as did defendant's. On this basis, the prosecutor argued an aiding and abetting theory:

"Let's look at aiding and abetting. . . . It could be one or the other brothers in this case, [defendant] or Michael Moore, and the defendant or the other brother knew that this perpetrator committed the crime, and during the commission of the crime was aiding and abetting. And the words and the conduct of the defendant did, in fact, aid and abet the perpetrator's commission of the crime so that's aiding and abetting."

Consistent with this argument, the trial court instructed on aiding and abetting. With this instruction and on the evidence presented in this case, the jury could have

18

decided that it was Moore who delivered the fatal blows and that defendant's aiding and abetting of Moore's assault served as the basis for the murder conviction.

Contrary to the Attorney General's argument, the jury could have relied on the evidence at trial to convict defendant of felony murder based on aiding and abetting Moore's assaultive behavior that resulted in McCraw's death. The possibility that jurors *might* have relied on a valid theory of murder does not establish beyond a reasonable doubt that jurors *did not* rely on the invalid theory. On this point, the United States Supreme Court has noted that "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . . When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." (*Griffin v. United States* (1991) 502 U.S. 46, 59 [116 L.Ed.2d 371].) Under the instructions given in this case, the jury's conviction of defendant on the charge of assault by means of force likely to result in great bodily injury was expressly but erroneously available as a theory for a second degree felony-murder conviction. Under the *Chapman* standard, the instructional error in this case cannot be said to have been harmless beyond a reasonable doubt.

## DISPOSITION

The convictions of first degree burglary and assault by means of force likely to result in great bodily injury are affirmed. We vacate defendant's conviction of second degree murder and remand the matter to the trial court. The People shall have 30 days within which they may elect to retry defendant on the charge of murder. If the People do

not elect to retry defendant, the trial court shall enter a new judgment and resentence defendant accordingly.

     /s/                         
HOCH, J.

We concur:

 /s/                         
RAYE, P. J.

 /s/                         
MAURO, J.